ERNESTO FOGLINO & Co., INC., Respondent, *v.* FRANK C. WEBSTER and Others, Copartners, Doing Business under the Firm Name and Style of KIDDER, PEABODY & Co., Appellants. (Appeal No. 1.)

First Department, June 4, 1926.

**Banks and banking** — action for anticipatory breach of irrevocable letter of credit issued by defendants to plaintiff — letter was issued against sale of coal and authorized payment on presentation of documents vised by representative of buyer — letter was extended until thirty days after lifting of embargo on export coal — exportation of coal was restricted in November, 1919 — said restriction was not removed until April 30, 1920 — plaintiff had thirty days thereafter to ship coal — cancellation of letter of credit prior to that time was anticipatory breach — damages — plaintiff is entitled to recover loss of profits — plaintiff not having received or paid for coal cannot recover on basis of loss through resale.

A letter issued by the defendants to the plaintiff at the request of the Italian Ministry of Shipping, which stated that the defendants had been instructed to open two credits for stated amounts to be used for the payment of a cargo of coal and directed to make payment to the plaintiff against delivery of documents vised by a representative of the buyer, and which did not by its terms authorize revocation, constituted an irrevocable commercial letter of

Foglino & Co., Inc., *v.* Webster. No. 1. **283**

App. Div. 282]          First Department, June, 1926.

credit for the amount stated, in favor of the plaintiff, and the defendants did not have the right prior to the termination of the letter to cancel the same.

A restriction or embargo was placed on the exportation of coal in the early part of November, 1919, during the time when the original contract of sale should have been performed, and the parties agreed to extend the contract and the letter of credit until thirty days after the embargo on export coal had been lifted. The embargo or restriction was not absolutely lifted until April 30, 1920. From all the evidence it is apparent that within the meaning of the terms extending the letter of credit, the plaintiff had the right to fulfill the contract at any time within thirty days after April 30, 1920, and since it was ready, willing and able to fulfill its contract during the month of May, the action of the defendants and the Italian Ministry of Shipment in canceling the letter of credit on April thirtieth constituted an anticipatory breach to which the defendants must respond in damages. The act of the defendants in canceling the letter of credit on the authority of the Italian Ministry of Shipping relieved the plaintiff of the necessity of tendering performance to the buyer.

The plaintiff is entitled to recover the loss of profit on the coal which it had purchased at a price of one dollar and fifty cents less than the price agreed to be paid to it by the buyer, but cannot recover anything for losses it might have sustained if it had actually received and paid for the coal and had been compelled by reason of the action of the defendants to thereafter sell the coal at a loss on a falling market, for not only did the plaintiff never receive and pay for the coal, but the corporation with which it had a contract of purchase simply abrogated the contract on learning of the cancellation of the letter of credit and relieved the plaintiff of any liability thereon.

APPEAL by the defendants, Frank C. Webster and others, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 8th day of June, 1925, upon a verdict rendered by direction of the court pursuant to a stipulation that the case be tried before the court without a jury and that the verdict be directed with the same force and effect as though a jury were present, and also from an order entered in said clerk's office on the 19th day of June, 1925, denying defendants' motion for a new trial made upon the minutes.

*Clifton P. Williamson* of counsel [*Edward W. Bourne* with him on the brief; *Alexander & Green,* attorneys], for the appellants.

*Avel B. Silverman* of counsel [*David Vorhaus* with him on the brief; *House, Grossman & Vorhaus,* attorneys], for the respondent.

DOWLING, J.  This action is brought to recover damages for the anticipatory breach or repudiation by defendants of an alleged irrevocable letter of credit issued by them in favor of plaintiff. The complaint alleges that prior to October 18, 1919, plaintiff entered into a contract with the Italian Ministry of Shipping, acting for and on behalf of the government of Italy, under and by virtue of which the plaintiff agreed to sell to the said Italian Ministry of

Shipping, and the latter agreed to buy from the plaintiff, two cargoes of coal in quantities and upon terms theretofore agreed upon and for the sum of $491,000. It is further alleged that as part of the terms and conditions upon which the said sale was to be made and effected the Italian Ministry of Shipping would thereupon open with a banking institution of the city of New York an irrevocable credit in favor of the plaintiff, under and by virtue of which the plaintiff would be assured and guaranteed the payment of the purchase price of the said coal upon delivery to the said banking institution of the following documents, viz.: (1) Ocean bill of lading (three originals and three duplicates); (2) invoices in triplicate; (3) railroad scale of weight of each individual cargo dumped into the vessel; (4) tidewater coal exchange certificate showing the pool number the coal has been drawn from; (5) insurance policy covering the cost of this shipment of coal, c. i. f.; that thereupon the Italian Ministry duly opened with defendants in favor of plaintiff a credit in accordance with the terms of the foregoing agreement, and the defendants on or about October 18, 1919, advised plaintiff that they had opened such credit under instructions from the Italian Ministry of Shipping, and acknowledged and agreed that it had opened two credits in favor of plaintiff in the sum of $262,000 and $229,000, the coal to be shipped by the end of October. The time for performance of the contract and the credits were extended by agreement to November 30, 1919.

It is then further alleged that the plaintiff, in reliance upon the credits then open in its behalf, proceeded to the performance of its contract with the Italian Ministry of Shipping, and made various contracts and arrangements for the purchase of the coal necessary to fulfill its contract and for the due financing of such purchases when by reason of the coal embargo laid by the government of the United States, and by reason of the freight conditions and shipping conditions, the plaintiff and the Italian Ministry of Shipping agreed to modify the contract then existing by extending the time of performance thirty days from the date of the official lifting of the embargo. It is averred that it was further mutually agreed at the said time that the credits opened for and on behalf of the plaintiff would be simultaneously extended to a date and be kept open thirty days after the day of the official lifting of the embargo; and that pursuant to the modification thus effected the defendants duly acknowledged and agreed that the two credits theretofore opened were extended to a period of thirty days after the official lifting of the embargo on the export of coal.

It is then set forth that in reliance upon the extensions thus procured and the continuance of the credits thus kept alive, the plaintiff

further proceeded to the fulfillment of its contract when on the 30th of April, 1920, the defendants and the Italian Ministry unlawfully withdrew the credits held by defendants in favor of plaintiff, and notified it that defendants would refuse to perform.

It is further alleged that at the time of the notification of the refusal to perform, thirty days had not elapsed from the day of the official lifting of the embargo on coal, nor had such embargo been officially lifted; that by reason of the premises plaintiff was unable to proceed any further in the performance of its contract, but that it duly performed all of the terms, covenants and conditions thereof, except in so far as performance was prevented by defendants. Damages for the breach are demanded in the sum of $50,000.

The answer admits that the Italian Ministry of Shipping opened two credits in favor of the plaintiff (one for $262,000 and the other for $229,000) to be used for the payment of two cargoes of coal, each delivered c. i. f. Italy, and instructed the defendants to pay plaintiff therefor against the delivery of certain documents. It admits delivery to the plaintiff of the four letters attached to the complaint, *i. e.:* (1) The instrument in suit; (2) the first extension thereof; (3) the second extension thereof, and (4) the letter constituting the alleged repudiation or withdrawal of the said credit. In all other respects the answer is a general denial.

The testimony shows that plaintiff, prior to October 18, 1919, had sold to the Italian Ministry of Shipping by contracts as modified two cargoes of Pocahontas and New River coal, the first to consist of from 5,000 to 7,000 tons, October loading, to be delivered c. i. f. Genoa at the price of thirty-three dollars and thirty cents per gross ton; the second, of 6,000 to 8,000 tons Pocahontas and New River coal, October loading, to be delivered c. i. f. Civitavecchia at the price of thirty-three dollars and twenty-five cents per gross ton. The coal was to be supplied from Hampton Roads pools No. 1 and No. 2. The original price fixed had been thirty-two dollars and eighty cents c. i. f. Italy and thirty-two dollars and seventy-five cents c. i. f. Civitavecchia. In the letter of September 30, 1919, from the Italian Ministry of Shipping to plaintiff acknowledging the purchase by the former from the latter of the first cargo, it was said: " This office will take care to inspect and pay for this cargo." In the letter of October 4, 1919, from the Ministry to plaintiff acknowledging the sale of the second cargo, the expression used was " The necessary money for paying this cargo is here at your disposal " (meaning at New York, where the letter was written by the accredited representative of the Ministry).

The Ministry did in fact fulfill and carry out its obligations by establishing a credit here in plaintiff's favor to pay for the coal

contracted to be sold.   On October 18, 1919, plaintiff received from the defendants the following letter:

" KIDDER, PEABODY & CO.

" 115 Devonshire Street                          17 Wall Street
      " Boston                                       New York

" By Hand   " NEW YORK, *October* 18, 1919.

" Messrs. ERNESTO FOGLINO & CO., INC.,
            " 11 Broadway,
                " New York City:

" DEAR SIRS.— We have today received instructions from Engineer A. Palanca of the Italian Ministry of Shipping requesting us to open two credits in your favor for $262,000 and $229,000, both to be used for payment of a cargo of coal, c. i. f. Italy, as follows:

" 'Against such credits you will make payment to the above said concern against the delivery of the following documents, duly viséed by the undersigned (Engineer A. Palanca).

" ' First — Ocean Bill of Lading (3 originals and 3 duplicates). Second — Invoices in triplicate.   Third — Railroad scale of weight of each individual cargo dumped into vessel.   Fourth — Tidewater coal exchange certificate showing the pool number the coal has been drawn from.   Fifth — Insurance policy covering the cost of this shipment of coal, c. i. f.

" ' Further instructions will follow regarding these credits in case that no shipment of coal will be made on or before the end of this month.'

Very truly yours,
        " KIDDER, PEABODY & CO."

It being impossible at the time to obtain the coal called for by the contracts, an extension of time for performance was agreed on, as well as a slight increase in price, and the following letter from the Ministry of Shipping was sent to plaintiff. confirming these modifications of the original contracts:

" ITALIAN MINISTRY OF SHIPPING
        " 291 Broadway
          " New York

"A. Palanca, N. A.                            *October 30th,* 1919.
" Messrs. E. FOGLINO & CO., INC.,
        " 11 Broadway,
            " New York City:

" GENTLEMEN.— This will acknowledge receipt of your letter of October 29th just received.

" With the view of trying to have definite action on these two

cargoes of coal sold by Dr. Foglino to the Italian Coal Comptroller, it is agreeable for me to modify the conditions as follows:

" Price to be $33.25 per gross ton c. i. f. Civitavecchia.

$33.30 per gross ton c. i. f. Genoa.

with the understanding that the coal supplied is to be Pocahontas and or New River coal from Hampton Roads pools #1 and 2.

"As I understand that you are going to ship these two cargoes via the S/Ss ' Haughland ' and ' Monceliere,' I am instructing Messrs. Kidder, Peabody & Company to keep the credits already established in force up to November 30th, 1919.

" Please advise definite loading dates of the above-mentioned two vessels, so that we may provide for the necessary inspection of the cargo while the steamers are loading.

" Yours very truly,

" FOR THE ITALIAN MINISTRY OF SHIPPING,

"A. PALANCA."

In further performance of their obligations under the contracts, the Ministry wrote defendants under the same date as follows:

" ITALIAN MINISTRY OF SHIPPING

" 23751                    " New York        *October 30th, 1919*

" Messrs. KIDDER, PEABODY & CO.,

" 17 Wall Street,

" New York City:

" GENTLEMEN.— Please refer to my letter #23062 dated October 17th establishing two credits in favor of Ernesto Foglino & Company, Inc., 11 Broadway, New York City.

" This is to inform you that these credits shall be kept in force to cover payment during the month of November and shall be considered as discontinued in case no shipments of coal are made before November 30th, 1919, in which case further instructions will follow as to the disposal of the amounts of money involved.

" Please confirm and notify Ernesto Foglino & Company, Inc., of this.                      Yours very truly,

" FOR THE ITALIAN MINISTRY OF SHIPPING."

In conformity with the instructions thus given defendants wrote plaintiff as follows:

" Messrs. ERNESTO FOGLINO & CO., INC.,

" 11 Broadway, New York:

" DEAR SIRS.— Referring to our letter of October 18th, we have to advise that these Credits shall be kept in force to cover payment during the month of November and shall be considered as dis-

continued in case no shipments of coal are made before November 30th, 1919, in which case further instructions will follow as to the disposal of the amounts of money involved.

" Kindly acknowledge receipt, and oblige,

" Very truly yours,

" KIDDER, PEABODY & CO."

A coal strike which had been imminent for some time finally became effective on November 1, 1919. Because of its threatened damage to our business prosperity and domestic comfort, the President of the United States on October 30, 1919, took advantage of the Lever Act, which was still in force (this country being still officially at war), and which among other things conferred upon him power to supervise and regulate the distribution of coal. (See 40 U. S. Stat. at Large, 284, § 25; Id. 283, § 24; 41 id. 1359, chap. 136; 42 id. 105, chap. 40.) By Executive Order dated October 30, 1919, he revoked prior orders made by him and restored all the rules, regulations, orders and proclamations theretofore suspended and restored to the Fuel Administrator, Dr. Harry A. Garfield (by Executive Order of November 5, 1919), his former power to " restore, change or make such rules, regulations, orders and proclamations fixing the prices or regulating the production, sale, shipment, distribution, apportionment, storage, or use, of all coal or coke as in his judgment may be necessary." The strike lasted from November first to the middle of December, 1919, during which time no bituminous coal was produced.

Because of the difficulties, if not impossibility, of procuring coal for export under these conditions, an extension of time of performance of the contracts in question was realized to be imperative. So, December 3, 1919, the Ministry wrote to defendants as follows:

" ITALIAN MINISTRY OF SHIPPING

" 291 Broadway

" New York

" A. Palanca, N. A.                              *December 3rd*, 1919.

" When replying refer to 25374

" Messrs. KIDDER, PEABODY & Co.,

" 17 Wall Street,

" New York City:

" GENTLEMEN.— Please refer *to* my letter #23062 dated October 17th and to my subsequent letter #23751 dated October 30th establishing two credits in favor of Messrs. E. Foglino & Company, Inc., 11 Broadway, New York City.

" On account of the strike conditions of the coal mines, this con-

cern has not been able to ship the coal covered by these two credits and therefore the subject of this letter is to authorize you to extend these two credits to be valid until thirty days after the official lifting of the embargo on export coal.

" If on the thirtieth day after the official release of embargo, one or both cargoes have not been shipped, credit shall be considered cancelled for the portion not shipped.

" Yours very truly,<br>
" FOR THE ITALIAN MINISTRY OF SHIPPING<br>
" (sgd)   A. PALANCA "

On the same day, following these instructions, defendants wrote to plaintiff:

" NEW YORK, *December* 5, 1919.

" Messrs. ERNESTO FOGLINO & CO., INC.,

" 11 Broadway, New York:

" DEAR SIRS.— Referring to the two credits opened in your favor by the Italian Ministry of Shipping for $262,000 and $229,000, we have been instructed to extend these two credits to be valid until thirty days after the official lifting of the embargo on the export of coal.   If on the thirtieth day after the official release of embargo, one or both cargoes have not been shipped, credit shall be considered cancelled for the portion not shipped.

" Kindly acknowledge receipt.

" Very truly yours,<br>
" KIDDER, PEABODY & CO."

Thereafter plaintiff continued its efforts to obtain the coal, necessarily embarrassed in such efforts by the conditions which existed.   On April 16, 1920, it finally was able to enter into a written agreement for the purchase of the coal called for by the two contracts, with the Alden Coal Mining Company.   This contract insured compliance with the terms of the contract between the Ministry and plaintiff.   It called for the delivery of 15,000 tons of Pocahontas and New River coal from pools No. 1 and No. 2 at Hampton Roads, 7,000 tons for delivery to Genoa, 8,000 tons to Civitavecchia.   The cargoes were to be loaded at Hampton Roads within thirty days.   The purchaser was to turn over satisfactory credits, and the seller testified that plaintiff told him of the existence of the credits in its favor with defendants, and the seller accepted them as satisfactory.   The price per gross ton was $31.75.

What is called the " embargo " was finally lifted on April 30, 1920.   As a matter of fact, between December 5, 1919, and April 30, 1920, there was never any " embargo " on coal in the ordinary

sense.    There was governmental control.    Richard A. C. Magruder, chief clerk to the commissioner of the Tidewater Coal Exchange, testified at length to what this governmental control consisted of. It is shown that following the order of the President on October 30, 1919, the Fuel Administrator delegated his powers as Administrator to the Director General of Railroads, Mr. Hines, by order dated October 31, 1919.    This order contained a preference or priority list of ten classifications for coal consumption.    The very last of these is tidewater coal, *i. e.*, coal for export.    Pursuant thereto, exports were permitted only after all domestic needs had been filled.    Governmental control of railroads ceased at midnight on February 29, 1920, or as stated in the Transportation Act of 1920 (41 U. S. Stat. at Large, 457, § 200) at 12:01 A. M. on March 1, 1920, and it became necessary to modify previous orders so that the administration of the restrictive orders affecting coal might be continued by another agency.    On February 25, 1920, the President, by Executive Order, reinstated the Executive Order of November 6, 1917, which required that all coal intended for export be shipped and consigned to the Tidewater Coal Exchange, whereof J. W. Howe, Rembrandt Peale, F. M. Whitaker and J. F. Fisher were appointed the President's representatives to carry out the provisions of the order; and they were vested with the authority theretofore vested in the Director General of Railroads relative to the export of coal from the United States.    The last provision of this order of February 25, 1920, required that it remain in full force and effect until midnight of April 30, 1920, when, unless otherwise ordered, it was to cease to be operative.

On March 1, 1920, a majority of the President's representatives on the Tidewater Coal Exchange committee (Howe, Peale and Whitaker) issued an order providing that:

" It is hereby ordered and directed that until further or other order by them or any of them that coal for bunkering vessels destined to foreign ports may be supplied only upon application to J. W. Howe (Singer Building, 149 Broadway, New York) and in accordance with permits issued by him.

" The exportation of cargo coal to foreign and insular ports or destinations is prohibited, except upon special authority in the form of permit issued in each case and upon each cargo by J. W. Howe (Singer Bldg., 149 Broadway, New York).    This order shall remain in force and effect until midnight of the 30th day of April, 1920, unless otherwise ordered."

This order continued in effect until April thirtieth, but on April ninth the committee modified it to the extent of allowing all bunkering without permits.

It appears that on March 23, 1920, the Secretary of State sent to the Italian Ambassador a communication reading: " The Secretary of State presents his compliments to His Excellency, the Appointed Ambassador of Italy, and has the honor to inform him that an arrangement has been made with the authorities which supervise the exportation of coal to grant permits for export of all coal purchased for Italy in the United States." But nothing was ever done by the Tidewater Coal Exchange committee, which alone had power in the premises, to exempt from its prohibition of exportation coal destined for Italy, or to grant any permits therefor.

With affairs in this condition, plaintiff having a valid subsisting contract for the coal, required to fulfill his contracts with the Ministry, made April sixteenth, which was to be fully performed by May sixteenth, less than thirty days after the embargo was lifted, on April 30, 1920, the Italian Ministry of Shipping and the defendants wrote to plaintiff notifying it of the cancellation of the credits.

The Ministry wrote as follows:

" Italian Ministry of Shipping,
" 291 Broadway,
" New York.

"*April 30th,* 1920.

" Messrs. Ernesto Foglino & Co.,
" 11 Broadway,
" New York City:

" Gentlemen.— Kindly note that, in view of your failing to deliver the two well-known cargoes of coal under c. i. f. conditions — notwithstanding that the absolute embargo against exportation of coal from United States to Italy was lifted during December last after which time big quantities of coal were monthly exported to Italy, both for private and government account — the two credits of $262,000 and $229,000 which had been opened by this office in your favor with Messrs. Kidder, Peabody & Company have been considered in agreement with the latter as automatically cancelled.

" We have informed of the cancellation our people abroad, while Messrs. Kidder, Peabody & Company have closed the relative credit accounts.          " Yours very truly,
" For the Italian State Railways,
" F. QUATTRONE."

Quattrone was the successor of Palanca who had then left the service of the Italian government.

The defendants' letter follows:

" KIDDER, PEABODY & Co.
" 115 Devonshire Street                                   17 Wall Street
    " Boston                          \                       New York
                              " NEW YORK, *April* 30, 1920.
" Messrs. ERNESTO FOGLINO & Co., INC.,
                              " 11 Broadway, New York:
    " DEAR SIRS.— Referring to the Credits which were opened by
us order of the Italian Ministry of Shipping for $262,000 and
$229,000 in your favor, we have to advise that these credits have
expired.                        Very truly yours,
                              " KIDDER, PEABODY & CO."

Treating this letter as a repudiation of the letter of credit and
an anticipatory breach thereof, as well as of the contract of sale,
since both the letter of credit and the time of performance of the
contract would not expire until May 30, 1920, plaintiff brought this
action and has recovered as damages the sum of $48,750, being the
difference between the contract price of the coal to the Ministry
and its market price, c. i. f. the respective ports in Italy, within
thirty days after April 30, 1920.

The first question to be determined upon this appeal is whether
the document issued by appellants to respondent constituted a
letter of credit.   The appellants concede that the letter of October
18, 1919, sent by them to respondent falls within some definitions
of a letter of credit (citing *American Steel Co.* v. *Irving National Bank*,
266 Fed. 41, 43, and Ward on American Commercial Credits, 29).
They also concede that no particular form is required for a letter of
credit (citing *Bank of Plant City* v. *Canal-Commercial T. & S. Bank*,
270 Fed. 477; *Border National Bank* v. *American National Bank*, 282
id. 73, and *Lamborn* v. *National Park Bank*, 240 N. Y. 520).   As
McCurdy says in his article on " Commercial Letters of Credit "
in the Harvard Law Review (Vol. XXXV, p. 542): " Their varia-
tions are almost infinite."   But appellants contend that the letter
in question did not constitute an irrevocable documentary letter of
credit because of the requirement that payment was to be made to
plaintiff thereunder only on the delivery of enumerated documents,
which were to be duly viséd by Engineer A. Palanca, representing
the Italian Ministry of Shipping.   It is contended that the necessity
for securing such visé before payment could be properly made under
the credit established, destroyed the legal effect which otherwise
would have been attached to the letter and rendered it impossible
to regard it as creating an irrevocable credit.   As the learned counsel
for appellants puts it in his brief: " In the usual letter of credit
transaction payment is made against drafts drawn by the bene-
ficiary accompanied by document, and the intervention of the party

at whose instance the credit is opened is neither required nor permitted.   Here payment was to be made in cash against documents viséd by Engineer A. Palanca, or really against the check of the Italian Ministry of Shipping.   Kidder, Peabody & Company was only a paymaster."

This objection is best answered in the language of Wilbert Ward in his work on "American Commercial Credits," (N. Y. 1922), the most helpful treatise on the subject which has come under my observation.   He thus defines a commercial letter of credit (at p. 9): "A buyer who can place in the hands of a seller a written instrument issued by the buyer's bank, authorizing the seller to draw in accordance with certain terms, and stipulating in legal form that all such bills will be honored, has at his command an instrument which will make his business more attractive to the seller than would otherwise be the case.   An instrument by which a bank gives formal evidence of its willingness to undertake this class of operation for one of its customers is what has come to be known as a ' Commercial letter of credit.'   A commercial letter of credit is normally, though not necessarily, issued in favor of a third party, usually a seller of goods, designated by the customer on whose behalf the credit is issued.   As we shall see, commercial letters of credit are issued in a great variety of forms and are made available in a great many ways.   The essential object in every case is the same — to evidence to a selected correspondent, or to bankers generally, the nature of the credit which the opening bank has committed itself to extend to its customer."   He then calls attention to the fact that though commercial letters of credit owe their origin to the early Roman and Lombard money changers, there has been until recent days little litigation about instruments known and used for centuries and there is no record of one of them having been passed upon by Lord MANSFIELD, who created the commercial law of modern England.   As the author says (at p. 10): " It is a tribute to the keen desire of bankers to honor their obligations without quibble, though it has contributed to the lack of understanding of the subject, that the use of commercial letters of credit has extended into these modern times without creating enough litigation, either in England or in this country, to define their legal implications."

So far from the requirement that an engineer should certify to the proper performance of the contract operating to destroy the character of the letter of credit, Ward in his work advances cogent reasons why such a provision is both desirable and advantageous, helpful alike to buyer and banker.   Thus in his chapter on " Protection of the Mercantile Risk," he says (at p. 210): " The proper

function of a bank is to finance business, and the proper function of a letter of credit is to serve as an instrument of finance. The personnel of a bank are trained to gauge the credit risk; they are not merchants, and their knowledge of the technique of the various lines is necessarily fragmentary;" and again (at p. 215): "Even though one may agree that banks cannot with propriety assume the responsibility of interpreting the contract of sale, it is hard to escape the conclusion that it is an anomalous situation which permits a seller to be confessedly in default in the performance of the terms of his contract of sale, and leaves the buyer nevertheless helpless to prevent him from collecting the purchase price by complying with the terms of the commercial letter of credit. The suggestion has been made, and while it has not met with favor, it is repeated here, that every commercial letter of credit should include, among the documents to be surrendered as evidence of the right to receive payment, a certificate by the beneficiary to the effect that the relative shipment complied with the terms of his contract of sale. A willfully false certificate of this character would undoubtedly bring the offender within the criminal statutes of some States and countries, and it would not be difficult to bring influences to bear to supply additional legislation where it was needed. Such a certificate might not stand in the way of an outright scoundrel, but would certainly give pause to the overshrewd trader who is ready to take advantage, so long as it is 'within the law.'" And he further says (at p. 222): "If the commercial letter of credit is intended to finance, for instance, shipments, in various parts, of a complete unit, it is not uncommon to stipulate that the beneficiary must provide an engineer's certificate with each shipment, indicating that the part in question has been properly constructed and is being sent forward in proper relation to the whole. Of a somewhat similar character is the Lloyds certificate issued with relation to ship's plates."

Thus, it would seem that the requirement for visé was an attempt to protect the buyer, and allow the buyer to pass on the performance of the contract between the buyer and seller. Ward further says (at p. 207): "It has always been understood and has recently been reaffirmed in decisions reviewed in Chapters XVII and XVIII, that the obligation of the bank which has issued a commercial credit to the seller of the goods as the beneficiary, is quite independent of the obligation between the buyer and the seller as such, evidenced by the contract of sale. A beneficiary does not become entitled to avail himself of a commercial letter of credit by performing the terms of his contract of sale, if the documents do not conform to the terms of

Foglino & Co., Inc., v. Webster.    No. 1.    **295**

App. Div. 282]        First Department, June, 1926.

the. credit.   Nor is it a ground for an injunction against payment
by the bank to the beneficiary that the terms of the contract of
sale have not been complied with, if the documents conform to the
terms of the credit."   There is a long line of authority supporting
the proposition that the letter of credit is independent of the
contract of sale.   In the recent case of *American Steel Co.* v.
*Irving National Bank* (266 Fed. 41) the Circuit Court of Appeals
for the Second Circuit said: " The law is that a bank issuing a letter
of credit like the one here involved cannot justify its refusal to honor
its obligations by reason of the contract relations existing between
the bank and its depositor.   *   *   *   There is but one vital ques-
tion involved in this case.   It is whether the letter of credit already
set forth herein is a complete and independent contract between
the plaintiff and the defendant.   This court is satisfied that it is,
and that by it the defendant gave authority to the plaintiff to
draw upon it up to the sum of $43,250, and impliedly promised to
pay drafts so drawn, when accompanied by certain specific docu-
ments, to wit, the invoices and bills of lading, provided the drafts
were drawn and presented prior to the expiration of the credit on
June 13, 1918.

" The defendant in effect seeks to read into the contract a
provision that the plaintiff's rights under the letter of credit should
be subject to the superior right of the MacDonnell Chow Corporation
to modify the contract which the bank had made with the plaintiff.
We do not so understand the law."

Appellants contend that if a third party's certificate had been
insisted upon the letter of October 18, 1919, would have fulfilled
the functions of an irrevocable, documentary letter of credit, but
" Where, however, the very party at whose instance a credit is
opened must consider before it is drawn against, the obligations
of the bank are so unlike those of the ordinary issuer of a docu-
mentary credit that only by courtesy can it be said to have issued
an irrevocable, documentary letter of credit."   In support of this
idea it quotes from the case of *Morgan* v. *Larivière* (L. R. 7 H. L.
423, revg. *Larivière* v. *Morgan*, L. R. 7 Ch. App. 550).   There the
French Committee of National Defense, whose agent in England
was one Joulin, executed a contract in November, 1870, with Lari-
viére for the purchase of 20,000,000 ball cartridges, deliverable in
lots of 25,000 or more.   On December 1, 1870, J. S. Morgan
& Co. wrote Larivière: " We are instructed by Mr. L. Joulin to
advise you that a special credit for the sum of £40,000 (say forty
thousand pounds), equivalent to frs. 1,000,000 (one million francs),
has been opened with us in your favour, and that it will be paid to
you rateably as the goods are delivered upon receipt of certificates

of reception issued by the French Ambassador or by Mr. L. Joulin." The plaintiff's bill alleged that the French Ambassador and Mr. Joulin vexatiously prevented performance of the sales contract and inequitably refused the proper certificates, and prayed that it be decreed that J. S. Morgan & Co. held the £40,000 in trust for the plaintiff. The lower courts held there was a trust, but the decisions were reversed by the House of Lords. Lord Chancellor CAIRNS said: " My lords, I read this letter as being nothing more than this: a statement by bankers to a tradesman who supplies goods to a customer of the bankers that they, the bankers, on behalf of their customer, will act as paymasters to the tradesman up to a certain amount of money; but that, in order to call upon them to act as paymasters, he, the tradesman, must bring with him a certain certificate shewing that the goods have been delivered to their customer. In a transaction of that kind there is nothing of equitable assignment, there is nothing of trust." And Lord CHELMS-FORD, concurring, said in substance: Supposing the fund had been withdrawn, and the French Ambassador had given checks on the appellants, would a court of equity say that parting with the money was a breach of trust, and that, therefore, they must pay for the cartridges and look for an indemnity to the French Government? By the contract the checks were to be drawn by the French Ambassador — by the letter, either by the Ambassador, or by Joulin. Suppose the certificates had been withheld, would the court order a payment by the appellants such as was not sanctioned in the manner prescribed by the authority, and suggest that if the certificate was improperly refused they had a remedy by action? I doubt if there was any consideration, even if the letter was a promise to pay; but I think that the letter created no trust, and that the decree of the court below cannot be supported.

Thus, the case quoted by appellants is authority only for the holding that the liability of the issuing bank was not that of trustee, and that there is no equitable assignment of funds.

I reach the conclusion that by the weight of authority and reason the letter in question was a commercial letter of credit, and, containing no words stipulating the possibility of revocation before its limit of maturity, it was irrevocable as well.

The appellants contend that the official lifting of the embargo on the export of coal took place not later than April 1, 1920, so that the defendants were correct in saying on April 30, 1920, that the credits had expired. This is based on the theory that the power of the Director General of Railroads " to divert, confiscate, reconsign and distribute all the coal " ended on April first, making coal available for export. They admit, however, that the Howe

committee remained in control under the Executive Order before cited after April first. But they say that " on and after April 1, 1920, there was, therefore, nothing which impeded the mining, transportation and exportation of coal. There was not even a semblance of an embargo." It is not denied that control in the form of making the obtaining of a permit prerequisite to the exportation of coal continued to exist until April thirtieth. Again, appellants say: " Concededly the Howe Committee had during the month of April, 1920, unlimited power to restrict the exportation of coal. The President had had that power since August 10, 1917, the date of the passage of the Lever Act (40 Stat. 276) and he continued to have it until March 3, 1921 (Chap. 136, Stat. 1921, 41 Stat. 1359).* The mere delegation of a power to restrict is not an embargo." But the Ministry of Shipping never took such a stand as that now advanced by appellants, nor did the latter ever indicate any reason why the credits had expired. In the letter to respondent dated April 30, 1920, the Ministry took the position that the embargo was lifted during December, 1919, and that, therefore, the credits were automatically canceled. The date thus fixed is absolutely untenable as that on which the embargo was lifted.

Of course, in its strict sense an embargo never existed during the period in question against the exportation of coal.

An embargo is a proclamation or order of State, usually issued in times of war or threatened hostilities, prohibiting the departure of ships or goods from some or all ports of such State, until further order. (*The William King*, 2 Wheat. [U. S.] 148.) But what the parties concededly meant by an embargo was a continuance of the conditions existent in this country by reason of a coal strike and of the continuance of a state of war, under which even if the exportation of coal was theoretically allowed under certain limitations it was practically impossible. This condition was realized and accepted by all the parties concerned herewith, buyer, seller and bankers alike. It was the reason why the time for performance of the contract and the time limit of the letter of credit were extended from the end of October, 1919, first to the end of November, 1919, and then to the period of thirty days after the official release of the embargo. A careful consideration of the voluminous executive orders and other official documents set forth in the record leads to the conclusion that the date of such " official release of the embargo " was April 30, 1920.

The respondent thus having thirty days after April 30, 1920,

---

* See 40 U. S. Stat. at Large, 276, chap. 53; Id. 284, § 25, also known as the Food Control Act of 1917; Id. 283, § 24; 41 id. 1359, chap. 136; 42 id. 105, chap. 49.— [REP.

within which to perform its contract with the Ministry, and to become entitled to receive the payments therefor from the irrevocable credits established for it with defendants, appellants, repudiated their contract and became guilty of an anticipatory breach thereof, when they wrote respondent on April 30, 1920, that the credits in its favor had expired. Such act of appellants relieved respondent as well from the idle form of tendering performance to the Ministry, which also had notified respondent that the credits were canceled. As has been heretofore said, the record establishes that respondent on April 16, 1920, had a contract in writing with a responsible corporation for the coal required to fulfill its contract with the Ministry; the coal and ships were available, and the cargoes would have been loaded at Hampton Roads before May sixteenth. Thus respondent was ready, willing and able to perform its contract by May sixteenth, well within the limit of thirty days after April thirtieth.

The sole remaining question is that of the measure of respondent's damages. It has recovered upon the theory that it was entitled to the difference between the contract price with the Ministry and the market price within thirty days after the official lifting of the embargo, amounting to $3.25 per ton, or $48,750. Both parties concede the rule of damages applicable to the breach of a letter of credit, which is thus laid down in *Doelger* v. *Battery Park National Bank* (201 App. Div. 515, 521) where this court said: " It seems to us that upon the breach of the contract by the defendant, the plaintiff became entitled to recover from the defendant the damages which it could have established in an action against the buyer, the Machinery Metals and Sales Company, that is to say, the difference between the then market value of the steel bars and the purchase price thereof as fixed by the contract between the plaintiff and the metals company."

In *Urquhart Lindsay & Co., Ltd.,* v. *Eastern Bank, Ltd.* (L. R. [1922] 1 K. B. 318), which is followed in the *Doelger* case, the court said: " The damages to which the plaintiffs are entitled are the difference between, on the one hand, the value of the materials left on their hands and the cost of such as they would have further provided, and, on the other hand, what they would have been entitled to receive for the manufactured machinery from the buyers, the whole being limited to the amount they could in fact have tendered before the expiry of the letter of credit."

What then were the damages which could be recovered by the respondent against the buyer, the Ministry, for its damages for the breach of its contract? The contract price thereunder for the coal was thirty-three dollars and thirty cents per gross ton at

Genoa and thirty-three dollars and twenty-five cents per gross ton at Civitavecchia.   Under the contract which respondent had with the Coal Export Corporation for coal to fulfill its contract, the price was thirty-one dollars and seventy-five cents per gross ton. The aggregate tonnage was fifteen thousand.   This profit, being the difference between said figures, has been treated as amounting to a flat one dollar and fifty cents per ton, thus making a loss to respondent of $22,500, being the aggregate profit it would have made had the contract been carried out.

While it is true that respondent had a valid contract at a firm price for the furnishing of this coal by the Coal Export Corporation, it never in fact received or paid for the coal, as it would have been required to do had it been obliged to make an actual tender thereof in the absence of any anticipatory breach of the letter of credit by appellants or of the contract of purchase by the Ministry.   In the event, having two cargoes of coal on hand, which it would be obliged to dispose of at a loss (the market having fallen meantime), it might perhaps have been entitled to add that loss to its lost profits as damages actually sustained.   So too, if sued or threatened with suit by the Export Corporation for breach of its contract with the former, when it did not in fact take the coal as agreed, the respondent might perhaps have added that element of damage to its loss of profits, as the financial injury caused by defendants' default and that of the Ministry.

But neither of these elements is present here.   As a matter of fact the Export Corporation simply treated their contract as at an end when they learned appellants' credits to respondent had been canceled.   I am, therefore, of the opinion that plaintiff's recovery is limited to the profit it would have made as shown by the difference between the two contract prices, viz., $22,500.   (*Henderson Tire & Rubber Co.* v. *Wilson & Son, Inc.*, 235 N. Y. 489.)

The judgment should, therefore, be modified by reducing the amount of the directed verdict on which it is based to the sum of $22,500 (with the addition of the interest allowed in the accompanying opinion in *Foglino & Co., Inc.*, v. *Webster, No. 2*, 217 App. Div. 300, on appeal from an order disallowing the same), and the judgment as so modified and the order appealed from affirmed, with costs to respondent.

CLARKE, P. J., MERRELL, McAVOY and MARTIN, JJ., concur.

Judgment modified as indicated in order, and as so modified the judgment and order appealed from are affirmed, with costs to the respondent.