EPHRAIM BRIL, Doing Business as Trans-American Commodity Exchange, Plaintiff, *v.* SUOMEN PANKKI FINLANDS BANK, Defendant.

Supreme Court, Special Term, Erie County, April 6, 1950.

*Maurice Lutwack, Louis Borins* and *Isadore Snitzer* for plaintiff.

*John D. Kernan, Jr.,* for defendant.

HALPERN, J. This action was brought to recover damages for anticipatory breach of an irrevocable letter of credit alleged to have been issued by the defendant bank in favor of the plaintiff.

The action was commenced by the attachment of the defendant's property in this State. After the defendant had appeared and answered, the plaintiff moved under rule 103 of the Rules of Civil Practice to strike out certain denials in the answer as sham and the defendant made a cross motion for a dismissal of the complaint under rule 106 for insufficiency on its face.

Upon the argument of the motions, the attorneys for both parties agreed that the whole transaction was evidenced by written documents and that the only questions in the case were questions of law for determination by the court. At the suggestion of the court and upon the agreement of counsel, supplemental motions were made by each of the parties seeking summary judgment under rule 113 in his or its favor.

The facts, as they appear from the affidavits and the exhibits attached thereto, are as follows:

The plaintiff, through his agent in Finland, Valtameri, Ltd., negotiated a contract with the Ministry of Supply of Finland for the sale of 7,500 metrical tons of Cuban raw sugar at £29 per 1,000 net kilograms, to be shipped from Cuba to Helsinki, Finland. The contract named the Hampton Timber Co., Ltd., as the seller but it is undisputed that the plaintiff was the true seller and that the Hampton Co. was his nominee. The contract was evidenced by a memorandum signed by the Ministry of Supply and by the plaintiff's Finnish agent, dated September 16, 1948. The memorandum provided that the manner of payment should be as follows: " Confirmed, irrevocable letter of credit, in freely transferable sterling, to be opened in the name of Hampton Timber Co., Ltd., London, beneficiary, Marine Trust Company, Foreign Dept., Buffalo, N. Y., or Cuba, valid for Sept./Oct. shipping." The memorandum of the contract sent to the plaintiff by the plaintiff's agent contained substantially the same terms and stated specifically that the letter of credit was " to be opened in London ".

The Ministry of Supply instructed the defendant bank to cause the appropriate credit to be opened and, on September 21, 1948, the defendant bank cabled to its correspondent bank in London, Hambros Bank Limited, as follows: " OPEN CONFIRMED

IRREVOCABLE TRANSFERABLE CREDIT 30411 ORDER MINISTRY SUPPLY HELSINKI FAVOUR HAMPTON TIMBERCO CASTLE HO HIGSTR HAMPTON MIDDX EXPIRY 21/12 UPTO 215325 POUNDS AGAINST INVOICE INSURANCEPOLICY FULLSET ONBOARD BLADINGS ORDER BUYER CERTIFICATE INSPECTION GENERAL SUPERINTENDENCE 2 BROADWAY R-201 TRODEXCH BLDG NEWYORK 4 COVERING 7500 TO CUBAN RAW-SUGAR POLARIZATION 96 DEGREES NEW JUTEBAGS 325 LBS NET EACH AT 29 POUNDS PER 1000 KG NET CIF HELSINKI INCLUDING AGENTS COMMISSION 1 PER-CENT SHIPMENT CUBANPORT PARTDELIVERIES AL-LOWED TRANSSHIPMENTS NOT TRANSFERABLE BENEFICIARY MARINE TRUSTCO FOREIGN DEPT BUFFALO NY/CUBA.''

On the same day, the defendant bank confirmed the cable by filling in and sending to the Hambros Bank, a printed form which it used for transactions of this type. The face copy was sent to the Hambros Bank. The fact that it was intended for the bank, was indicated by an arrow opposite its name on the form. It gave the credit number which had been used in the cablegram (30411), it gave the name of the beneficiary and the amount of the credit and it specified the documents which were to accompany drafts under the credit, and it described the merchandise to be covered by the documents, in substantially the same terms as had been used in the cable.

Ōpposite the printed legend '' Kind of credit '' in the printed form, the defendant bank wrote '' confirmed irrevocable and transferable, not confirmed on your part.'' In the lower left hand corner of the printed form there appeared: '' We request you kindly to open the above mentioned credit.'' In the lower right hand corner were the words: '' Opening of Doc. Credit.'' The printed form concluded: '' Yours faithfully, Suomen Pankki-Finlands Bank.'' Presumably, the original sent to the Hambros Bank was signed by an officer of the defendant bank, although the photostatic copy supplied upon the present motions is unsigned.

A carbon copy of this letter was sent to the Ministry of Supply, Helsinki. The printed form used for the carbon had blank spaces arranged to correspond with the spaces upon the face copy and the printed legends were the same except that there was an arrow opposite the place for the name of the bank's customer on the carbon copy, whereas there was an arrow opposite the place for the name of the correspondent bank on

the face copy. Also, in the lower left hand corner of the printed form used for the carbon copy, instead of the sentence quoted above, there appeared: '' We confirm the opening of the above mentioned credit '', thus advising the customer of the defendant bank, the Ministry of Supply, that it had taken steps in accordance with its instructions to open the requested credit.

No copy of the letter was sent to the plaintiff by the defendant or by anyone else by authority of the defendant. However, the plaintiff's agent in Finland, Valtameri, Ltd., cabled the plaintiff on September 21st, in part, as follows: '' SUPPLY MINISTRY CABLED TODAY ACCORDING YOUR INSTRUCTIONS LETTERCREDIT 30411 HAMBROSBANK LONDON POUNDS-STERLING 215321.''

Further cables and correspondence followed between the plaintiff and his agent with respect to requests for change of the transferable beneficiary and these requests were transmitted by the agent to the defendant and, in turn, by the defendant to the Hambros Bank so that the request in its final form was for a letter of credit with the plaintiff personally named as transferable beneficiary.

Upon the receipt of the request form from the defendant bank for the opening of the credit, the Hambros Bank applied to the Bank of England on September 22, 1948, for permission to '' establish '' an irrevocable bankers' credit in the amount of £215,325 on behalf of the defendant bank for the account of the Ministry of Supply, in favor of the Hampton Timber Co. of England. The application stated that the drafts were to be drawn on the Hambros Bank, that the merchandise would consist of Cuban raw sugar to be shipped from Cuba to Finland and that payment was to be made to an American account with reimbursement from a Finnish transferable account. The application was signed by a rubber stamp bearing the name of the defendant bank, followed by a rubber stamp bearing the name of the Hambros Bank, and it was verified by an officer of the Hambros Bank.

The Bank of England refused to grant the requested permission and stamped the application '' Not allowed Bank of England 23 Sep 1948 ''. Thereafter, upon the receipt of word that the plaintiff desired to have the transferable beneficiary changed from the Marine Trust Co. to himself, the application form was accordingly changed and was resubmitted to the Bank of England and permission was again refused on September 29, 1948.

On September 24, 1948, the Hambros Bank cabled the defendant bank as follows: "YOURS TWENTYFIRST TRANSFERABLE CREDIT 30411 FAVOUR HAMPTON TIMBER NOT ALLOWED STOP AUTHORITIES WILL NOT PERMIT TRANSFER STERLING TO USA OR CUBA."

Word of this refusal was apparently communicated to the plaintiff's agent in Finland and it cabled to the plaintiff on September 27, 1948: "BANK OF ENGLAND DOES NOT ALLOW TRANSFERRING TRANSFERABLE STERLING TO USA AND CUBA PLEASE INVESTIGATE CABLE."

On September 26, 1948, the plaintiff had cabled to the Hambros Bank as follows: "RECREDIT FINLAND 30411 IN ORDER NEGOCIATE HERE PLEASE CABLE OUR EXPENSES DETAIL TERMS C/C EPHRAIM BRIL PURCHASE AGENT TRANSAMERICA COMMODITY EXCHANGE 1176 MAIN STR BUFFALO NY CABLE ADDRESS." The Hambros Bank replied on September 29, 1948, by letter, which quoted the plaintiff's cablegram and, in reply thereto, stated: "but must inform you that the Exchange Control Authorities here will not permit this Credit to be opened so we cannot proceed further in the matter."

Thereafter, in view of the action of the English authorities, the defendant bank, at the ministry's suggestion, cabled the Hambros Bank, canceling its request that a letter of credit be issued.

This was, in substance, the end of the transaction. Correspondence by cable and letter followed between the plaintiff and his agent in Finland and also between the plaintiff and his agent on the one hand and the defendant bank and the Ministry of Supply on the other, but nothing was accomplished.

The plaintiff's agent, the ministry and the defendant bank sought to explain why they could not go forward with the matter. On the other hand, the plaintiff repeatedly complained in his letters that no letter of credit had ever been issued in accordance with the Ministry's contract. He made various suggestions, without prejudice, as to how the transaction might be revived and the contract carried out. Finally, the plaintiff advanced the theory which is the basis of the present action, that the letter of instructions sent by the defendant bank to the Hambros Bank, of itself, constituted a letter of credit in favor of the plaintiff and that the defendant's subsequent conduct amounted to an anticipatory breach of the letter of credit. The plaintiff accordingly brought this action to recover dam-

ages for the breach (*Foglino & Co.* v. *Webster*, 217 App. Div. 282, mod. 244 N. Y. 516, 563). The defendant denies that any letter of credit had ever been issued to the plaintiff.

It appears that, in the course of its effort to explain the history of the transaction to the plaintiff's Finnish agent, the defendant bank sent him a copy of all the relevant correspondence and documents on October 14, 1948. Among these papers was included an unsigned copy of the carbon copy of the instructions sent to the Hambros Bank by the defendant bank which is described above. This was transmitted by the plaintiff's agent to the plaintiff on October 21, 1948. This is the way in which a copy of the letter of instructions came into the possession of the plaintiff. A copy of the letter is attached to the complaint as Exhibit B and it is relied upon by the plaintiff as constituting the letter of credit.

It will be noted that the plaintiff obtained possession of the letter long after he had received explicit notice from his own agent and from the Hambros Bank that a letter of credit would not, and could not, be issued.

It is clear upon the face of the papers that the letter does not constitute a letter of credit. It is obviously a copy of an interbank letter of instructions with respect to a letter of credit thereafter to be issued. (Cf. Standard Interbank form approved by the American Acceptance Council, Edwards on Foreign Commercial Credits, p. 209.) The copy was not intended for the plaintiff but was intended solely for the Ministry of Supply for its information, as indicated by the arrow opposite the Ministry's name. The letter was not addressed to the plaintiff nor was it mailed to the plaintiff by the defendant bank or with its authority. It does not, in terms or by implication, purport to create any obligation on the part of the defendant bank to the plaintiff.

The law on the subject of letters of credit has not heretofore been codified but the American Law Institute is now engaged in preparing a Uniform Commercial Code, article 4 of which will deal with letters of credit. The sections of the proposed code which are relevant here are codifications of the existing law and recourse may therefore be had to them for a concise statement of the principles governing this case. A bank credit is defined in subsection 1 (a) of section 4-103 of the proposed code (May, 1949, Draft) as follows: " A ' credit ' is a signed writing by which a bank engages to honor drafts drawn pursuant to its terms and includes an authority to pay or to purchase

such a draft. A bank making such an engagement is an ' issuer '."

Section 4-104 of the proposed code reads as follows: " Except as required by the definition in the preceding Section no particular form or phrasing is required for a credit. A telegram may constitute a credit if it identifies its sender by an authorized signature in code or otherwise, and it is sufficient if an authorized correspondent names the issuer when advising of the issuance of the credit."

The definition is aptly referred to in the comment by the American Law Institute as laying down a " statute of frauds " with respect to letters of credit. (See comment, § 4-104.)

As appears from the foregoing sections, a letter of credit need not be in any particular form or phrasing but there must be some writing directed to the beneficiary and delivered to him by the issuing bank, or pursuant to its authorization, which purports to bind the issuing bank to be responsible for drafts drawn under the letter of credit.

There must be a writing, signed by the issuing or advising bank, in code or otherwise, and delivered to the beneficiary, in order to give rise to an enforcible obligation. See the reference to delivery to the beneficiary in subsection (3) of section 4-105 of the proposed code: " After the beneficiary has received authorized advice of the opening of an irrevocable credit the issuer can neither modify nor cancel the credit without the beneficiary's consent."

In this case no authorized advice of the opening of a credit was given to the plaintiff either by the Hambros Bank or the defendant bank or by anyone acting on their behalf. The cables and letters to the plaintiff from his own agent, advising him of what he had learned from the Ministry of Supply (or what he thought he had learned) as to the progress of the transaction did not constitute authorized banker's advice to the plaintiff, and could not impose a binding obligation upon the banks or either of them.

The most recent authoritative work on bank credits is that of Ward and Harfield, entitled " Bank Credits and Acceptances in International and Domestic Trade " (3d ed., 1948). A commercial letter of credit is defined in this work as follows: " The instrument by which a bank, for account of a buyer, gives formal evidence to a seller of its willingness to permit him to draw on certain terms and stipulates in legal form that all such bills shall be honored is what has come to be known as a ' commercial letter of credit.' " (P. 8.)

This definition, as it appeared in an earlier edition of the text, was cited with approval in *Foglino & Co.* v. *Webster* (217 App. Div. 282, 293, *supra*).

Messrs. Ward and Harfield continue in their text: " The essential characteristic of a bank credit * * * is that it should contain an affirmative undertaking on the part of the bank to honor the beneficiary's drafts. This undertaking is best expressed by a written statement that the bank agrees with the drawers, endorsers, and bona fide holders of drafts drawn under and in compliance with the terms of the instrument that the same shall be duly honored on presentation to the drawee named in the instrument." (P. 9.)

The letter here relied upon is wholly lacking in this essential characteristic of a banker's letter of credit.

It appears from the correspondence between the plaintiff and his agent that the plaintiff was aware of the fact that the transfer of sterling to American accounts was strictly controlled by the English authorities, prior to his entering into the contract of sale with the Ministry of Supply.

On September 9, 1948, the plaintiff's Finnish agent cabled to the plaintiff: " REGRET STERLING TRANSFER TO USA IMPOSSIBLE."

After the contract had been entered into, the plaintiff cabled his Finnish agent on September 20, 1948, in part, as follows: " REURCAB EIGHTEENTH HAVE CHARTERED STEAMER RELY CABLE CREDIT OPENED LONDON WHICH MUST BE WITH PERMISSION BANK OF ENGLAND TO NEGOTIATE AT OFFICIAL PEGGED RATE. * * * " It will be noted that this cable antedated the issuance of the letter of instructions to the Hambros Bank by the defendant bank upon which the plaintiff relies.

On September 24, 1948, the plaintiff's agent wrote to him in part: " We now venture to hope, that the L/C concerning this sugar business now definitely will be in order, and that no unpleasant surprises — as for instance from the side of the Bank of England — will occur in this respect, because we on our part, as well as the Ministry of Supply, have understood, that you already before the conclusion of this business have thoroughly clarified and negotiated with London regarding this matter, as your offer was based upon £-Sterling payment through a L/C opened in London, Hampton Timber Ltd. appearing as Seller. In case you have not made so, troubles perhaps cannot be avoided."

After the predicted " troubles " had arisen, the plaintiff's Finnish agent wrote to him under date of October 5, 1948, in part, as follows: " The Bank of England does not, however, permit transferring of transferable £-sterling to USA or Cuba, of which fact you ought to have been aware by our telegram of September 9th, and when asking you to offer us the sugar with an English firm appearing as Seller, we of course presupposed that you would arrange the disposal of the £-sterlings in England. This you however had omitted to do, and as a consequence, the result of this business was for you, as well as for our buyers and us, thoroughly negative."

In view of the knowledge of both parties that the approval of the English authorities was required for a transfer of sterling to an American account, it is clear that there was no intent on the part of the defendant bank to issue a letter of credit and no expectation on the part of the plaintiff that he would receive such a letter, until approval had been obtained from the English authorities.

Viewed realistically, the plaintiff's claim amounts to this: that, despite the fact that both parties knew that the approval of the English authorities was necessary, the defendant bank foolishly or carelessly first committed itself to a definite and unconditional obligation to pay drafts drawn by the plaintiff in sterling without having obtained such approval, and then, when the necessary approval was refused, it repudiated the obligation. The documents clearly show that the defendant did not engage in any such improvident course of conduct.

The plaintiff may have a good claim against the Ministry of Supply if it is found that the Ministry of Supply improvidently entered into an unconditional contract to pay an American vendor in sterling out of an English bank account, without regard to approval by the English authorities, but this, of course, does not give rise to any right of action against the defendant bank.

The plaintiff places great reliance upon a letter written by the defendant on November 26, 1948, in response to a letter by the plaintiff inquiring as to why no confirmation had been received from the Hambros Bank of the opening of the credit. The defendant's letter reads, in part, as follows:

" We are in receipt of your letter dated November 18th, 1948, and we beg to inform you that we have opened the credit No. 30411/47392 for £215.325.— with Hambros Bank Limited, London, in favor of Hamton Timber Co. Ltd., Castle HO-High

Street, Hamton/Middlesex, by order of the Ministry of Supply, Helsinki. According to our instructions this credit should be transferable, and we beg to point out that all our funds in pounds Sterling held by the Hambros Bank Limited on our account are transferable.

" The reason for which the Hamton Timber Co. Ltd. has not been able to transfer this credit in your favor is that the Bank of England has not permitted the transfer of pounds to the United States and Cuba in spite of the ' transferable ' nature of our account with the Hambros Bank Limited. Consequently these funds cannot be transferred from one account to another as mentioned by you."

The plaintiff construes this letter as an admission by the defendant that the letter of instructions sent by the defendant to the Hambros Bank, under date of September 21, 1948, constituted a letter of credit, but the statements in the defendant's letter cannot be fairly so construed. It will be noted that the defendant did not say that a letter of credit had been issued but merely said that it had opened a credit with the Hambros Bank. The sending of a letter of instructions by one bank to another bank in a foreign city with respect to a credit may be referred to as the " opening " of the credit (*Courteen Seed Co.* v. *Hong Kong & Shanghai Banking Corp.*, 216 App. Div. 495, affd. 245 N. Y. 377). But the opening of the credit in this sense must be differentiated from the issuance of the letter of credit to the beneficiary. The opening of the credit by the interbank communication does not of itself create any obligation on the part of either bank enforcible by the proposed beneficiary. That obligation arises only when a letter of credit is actually issued by one of the banks and is delivered to the beneficiary. The contract between the opening bank and the beneficiary comes into existence at the time of the delivery of the letter of credit to the beneficiary and not earlier. See the authorities cited above and see, also, Thayer, " Irrevocable Credits in International Commerce: Their Legal Nature " (36 Col. L. Rev., 1031, 1036–1037, 1052–1053, 1057): The obligation arises at " the moment of communication " (p. 1052) when " the promisor yields dominion over the written instrument to the promisee " (p. 1052, footnote 120). " It seems fair to say its [the credit's] communication is completed when it is entrusted by the bank to the post or to the telegraph office, as the case may be." (P. 1057, footnote 129.)

It is thus apparent that the statements in the defendant's letter do not support the plaintiff's claim that a letter of credit had actually been issued.

Furthermore, even if we assume that the defendant's letter may be construed to mean that a letter of credit had been issued, it is simply an erroneous historical statement as to what had theretofore taken place. Such a statement made long after the event is not entitled to any weight as against the plain meaning of the documents involved in the transaction itself, which clearly show that no letter of credit had actually been issued.

Finally, even if the plaintiff's construction of the letter of November 26, 1948, is adopted, the plaintiff cannot make it the basis of any claim for damages. No damage could have been suffered by the plaintiff in reliance upon the statements contained in the defendant's letter since the letter was received long after the plaintiff had been advised that the attempt to establish a credit had been abandoned because of the disapproval by the English authorities. In any event, this action is not brought upon the theory that the defendant had negligently made an erroneous statement which resulted in damage to the plaintiff (cf. *Courteen Seed Co.* v. *Hong Kong & Shanghai Banking Corp.*, 245 N. Y. 377, *supra*). This action is brought solely upon the theory that the defendant bank had, in fact, issued an irrevocable letter of credit and then had repudiated it. The action must stand or fall upon the claim that Exhibit B attached to the complaint constitutes a letter of credit in favor of the plaintiff. For the reasons heretofore given, I have concluded that this document does not constitute a letter of credit.

In view of this determination, there is no need to give any extended consideration to the question of the exact form in which the letter of credit would have been issued under the instructions to the Hambros Bank, if the bank had reached the point of sending a letter to the plaintiff. However, in view of the conflicting interpretations of the letter of instructions advanced by the parties, it may be appropriate to consider this question briefly.

It is difficult to determine from the documents whether it was contemplated that the letter of credit to be sent to the beneficiary would name the Hambros Bank or the defendant bank, as the opening bank. The defendant contends that the letter of credit was to be issued by the Hambros Bank on its own behalf and that the name of the defendant bank was not to appear in the letter of credit at all. In support of this interpretation of the

documents, the defendant points out that the contract of purchase and sale specifically provided that the letter of credit was to be opened in London and that all the correspondence between the parties referred to the opening of a letter of credit in London. The defendant also points out that the Hambros Bank, acting under the letter of instructions, applied to the Bank of England, not for leave to '' advise '' the beneficiary of a credit opened by another bank but for leave to '' establish '' a credit. This is said to be in accordance with the general practice when a customer of a continental bank desires to have a letter of credit issued, under which drafts are to be paid in sterling in England (see affidavits submitted by the defendant and see, also, Edwards on Foreign Commercial Credits, p. 190).

While this interpretation of the documents may be in accordance with common practice, it is difficult, if not impossible, to reconcile it with the typed matter in the letter of instructions in the box designated '' Kind of credit ''. As noted above, the defendant typed in this box '' confirmed irrevocable and transferable, not confirmed on your part.'' The words '' not confirmed on your part '' clearly indicate that the Hambros Bank was not° to assume any responsibility in connection with the credit. The defendant's request in this form must have contemplated that the correspondent bank would send the beneficiary a letter advising that the defendant had opened a credit with it but not adding its responsibility to that of the defendant. Under such an arrangement, the Hambros Bank would function as the advising or notifying bank, and might also function as the paying bank, but it would not be a confirming bank.

See section 4-110 of the proposed Uniform Commercial Code: '' Where a bank advises that another bank has issued a credit the advising bank thereby assumes obligation to the beneficiary only for the accuracy of its own statement; but by confirming an irrevocable credit it assumes direct obligation as an issuer.''

Messrs. Ward and Harfield in their work on Bank Credits, cited above, explain the relationship as follows:

'' There is a choice of methods by which the opening bank may make such a credit available to the beneficiary. The choice, for reasons mentioned in the previous chapter, depends largely upon whether the credit is issued in the currency of the beneficiary or that of the accredited buyer. If the buyer's currency is the agreed medium of exchange, it is likely that the bank that opens the credit will evidence its willingness to finance the transaction by a writing, addressed either to the beneficiary

or to persons in general, in the expectation that some banker at the domicile of the beneficiary will be induced thereby to advance funds to the latter by negotiating his drafts drawn in accordance with the terms of the credit. The opening bank may prefer, however, not to notify the beneficiary of the existence of such a credit directly, but rather, through the medium of a correspondent in the vicinity of the beneficiary. If the opening bank requests a correspondent bank to notify the beneficiary of the existence of the credit, the correspondent is termed the ' advising ' or the ' notifying ' bank.'' (Pp. 22–23.)

'' If the credit is transmitted to the beneficiary through the medium of a notifying bank, the latter bank assumes no obligation other than to vouch for the authenticity of the information it transmits.'' (Pp. 14–15.)

'' If a correspondent of the opening bank in the vicinity of the beneficiary is instructed to hold itself out to the beneficiary as being responsible for the payment of drafts drawn in accordance with its stipulations, it is called the ' confirming bank.' '' (P. 25.)

The standard forms adopted by the American Acceptance Council and reproduced in Ward and Harfield's text and in Edwards on Foreign Commercial Credits are illuminating in this connection. The form reproduced in Edwards on Foreign Commercial Credits at page 212, and Ward and Harfield at page 167, is the standard form of letter of advice to the beneficiary to be sent by the correspondent bank, advising of the opening of an irrevocable credit by the opening bank. This letter concludes: '' This letter is solely an advice of credit opened by ————————— Bank and conveys no engagement by us.'' The form in Edwards at page 213, and Ward and Harfield at page 170, is the standard form of a letter of advice of a confirmed irrevocable credit. This letter concludes, as follows: '' We confirm the credit and thereby undertake that drafts drawn and presented as above specified shall be duly honored [by us].''

The only meaning which can be attributed to the words '' not confirmed on your part '' in the letter of instructions from the defendant bank to the Hambros Bank, in the light of the banking practice set forth above, is that they indicated that the Hambros Bank was to be the advising bank but that it was not expected to confirm the letter of credit on its own behalf. Apparently, the only letter which was to be sent to the beneficiary was to be that of the Hambros Bank as the advising

bank. This is in accordance with common practice and is recognized as an adequate method of creating an obligation on the part of the opening bank which is designated as such in the advising letter, even though it does not itself send any letter to the beneficiary (American Law Institute proposed code, § 4–104, and see Ward and Harfield). If, as the defendant contends, the Hambros Bank was to serve as the opening bank, the letter of credit would, of course, bind it as a primary obligor. The words "not confirmed on your part" in the letter of instructions would be wholly inconsistent with the assumption of that obligation by the Hambros Bank. It was impossible to have the Hambros Bank serve as an opening or issuing bank and still have it remain free from responsibility for the credit.

It may be noted that the word "confirmed" appears also in the first part of the description of the "Kind of Credit" in the letter of instructions ("Confirmed, irrevocable and transferable"). As used here, the word "confirmed" is redundant. It is synonymous with the word "irrevocable" and indicates that the opening bank has undertaken a binding obligation which it has no power to cancel (4 Williston on Contracts, § 1011C). The word is frequently used in this redundant manner by continental banks (Edwards, op. cit., pp. 168, 190–191) and it is sometimes so used by American banks (6 Michie on Banks and Banking, § 28, p. 269). This use of the word "confirmed" may have originated in the idea that the bank, in effect, confirmed the seller's obligation to arrange for a bank credit (Thayer, op. cit., pp. 1034–1035). Preferred modern usage would limit the word "confirmed" to the description of the relationship of the advising bank to the transaction:

"A credit advised by a notifying bank, in which the notifying bank confirms the undertaking of the opening bank to honor drafts drawn under the authority so given, is a confirmed banker's credit.

"This conception of a confirmed credit is in accord with the proper meaning of the word. The word 'confirm' is derived from the Latin, con plus firmare, 'to make firm.' Its dictionary definition is 'to make firm or firmer; to add strength to; to corroborate.' Confirmation is defined as 'a strengthening, ratifying, or sanctioning; that which gives new strength to.' It connotes an addition to something already in existence — additional security to an obligation already in force.

"It is true that a confirmed banker's credit is irrevocable. However, if we confine the term 'irrevocable' to a credit in

which the right of cancellation is waived, and the term ' confirmed ' to a credit in which one bank adds its obligation to that of another, the language used will illuminate instead of obscure the difference between two allied but separate principles.'' (Ward and Harfield, *op. cit.*, pp. 18–19.)

I, therefore, conclude that, in view of the form of the letter of instructions, the parties must have contemplated that the Hambros Bank would send a letter of advice to the named beneficiary advising of the opening of a credit by the defendant bank for which the defendant bank would be solely responsible. However, for the reasons given earlier, this construction of the documents does not aid the plaintiff. It is clear under the authorities that when an opening bank instructs a correspondent bank to send a letter of advice to a proposed beneficiary, no obligation on the part of the opening bank arises until the correspondent actually issues the letter of advice to the beneficiary (Thayer, *op. cit.*, p. 1057). The Hambros Bank did not send the plaintiff a letter of credit of any kind. On the contrary, as appears from the correspondence quoted above, upon the plaintiff's first inquiry of the Hambros Bank as to the situation, the Hambros Bank advised the plaintiff that the exchange authorities would not permit the credit to be opened and that, for that reason, no further steps could be taken by the bank.

A final point remains to be noted as to the conflict of laws aspect of the case. The plaintiff's case rests upon the theory that a letter of credit had actually been issued to the plaintiff and had been received by him in New York State. Under the plaintiff's view of the case, the law of New York might possibly be applicable (see page 20 of Notes and Comments accompanying the proposed final draft of the Commercial Code, American Law Institute, April, 1948). However, under the conclusion which I have reached, the document relied upon by the plaintiff was not a letter transmitted to him by authority of the defendant bank, but was merely a copy of a letter of instructions which was sent by the defendant bank in Helsinki, Finland, to the Hambros Bank in London, England. Upon this view of the case, the law governing the interpretation of the document would seem to be that of either Finland or Great Britain, but neither of the parties has directed the court's attention to any statement of Finnish or British law. The case has been presented and submitted upon the assumption that the governing law is the same as that of New York; neither party has made any claim that the Finnish or British law is, in any relevant

particular, different from that of New York. While section 344-a of the Civil Practice Act gives the court discretionary power to take judicial notice of foreign law, no independent research as to the Finnish or British law has been undertaken by the court.

Since the credit was to be opened in London, the British law is probably the governing law. There is a presumption that the common law of England is the same as the common law of New York, in the absence of a showing to the contrary, either by proof or by invoking the doctrine of judicial notice (Cf. *Cherwien* v. *Geiter*, 272 N. Y. 165).

If the Finnish law were relevant, a more difficult question would be presented, since the Finnish law is outside the Anglo-American legal tradition, and there is no general presumption that it is the same as that of common-law countries (*Arams* v. *Arams*, 182 Misc. 328, and cases therein cited). However, even in that situation, the New York courts would look to the law of New York as furnishing the rule of decision with respect to a commericial transaction of the type here involved, in the absence of any showing or claim that a different rule should apply (cf. *Arams* v. *Arams, supra*).

The case has accordingly been decided on the basis of the New York law.

The motion by the plaintiff to strike out portions of the defendant's answer and the motion by the plaintiff for summary judgment are both denied.

The motion by the defendant for summary judgment is granted and judgment may be entered herein dismissing the complaint.