**VENIZELOS, S.A.,** Appellant,

v.

**CHASE MANHATTAN BANK,** Appellee.

**No. 611, Docket 33552.**

United States Court of Appeals,
Second Circuit.

Argued March 10, 1970.

Decided April 29, 1970.

Rehearing Denied May 26, 1970.

Joseph Cardillo, Jr., New York City (Cardillo & Corbett, New York City, Christophil B. Costas, New York City, of counsel), for appellant.

Andrew J. Connick, New York City (Milbank, Tweed, Hadley & McCloy, New York City, Ellis W. McCracken, Jr., New York City, of counsel), for appellee.

Before SMITH, KAUFMAN and HAYS, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

Venizelos, S.A. [hereinafter "Venizelos"] appeals the grant of a motion for summary judgment in favor of appellee Chase Manhattan Bank [hereinafter "Chase"] on the three claims asserted by appellant in its complaint and the denial of appellant's cross-motion for summary judgment by the District Court for the Southern District of New York, David N. Edelstein, Judge. We find error in the grant of summary judgment against the claims in the first two causes of action, reverse and grant summary judgment to appellant for the sums sought in those two claims; however, we find no error in the order granting summary judgment to appellee on the third cause of action and affirm as to it.

All three claims arose out of a charter party by Perfiles LaPaz, S.A. de C.V. [hereinafter "Perfiles"] and a letter of credit confirmed by Chase in regard to such charter.

On June 10, 1965 Venizelos, as agents for the owners of the S.S. "Anastassis" entered into a charter party with Perfiles; the charter was to be for five voyages by the charterer (Perfiles), carrying scrap metal cargoes from a United States port to Mexico. The contract contemplated Perfiles' use of the vessel "Anastassis" and described the vessel as a standard American built Liberty vessel. The "Anastassis" and other similar vessels typically carry about 9500 deadweight tons of cargo. One of the provisions of the charter party was that Perfiles was to pay Venizelos by means of a revolving letter of credit which was to be maintained at Venizelos' bank in New York (the Atlantic Bank). The minimum in this letter of credit was to equal the minimum freight for two voyages and upon payment of one freight, Perfiles was to replenish the funds paid before it could reload the vessel for the next voyage. The contract further provided that the letter of credit would include an additional amount of $5,000 per voyage to cover Perfiles' liability for stevedore damages and/or demurrage.

Toward compliance with these requirements, Perfiles caused the Banco Azteca, S.A. [hereinafter "Banco"] of Mexico to open an irrevocable credit in a sum not exceeding $82,830, and on August 16, 1965, Chase issued its confirmation of the letter of credit in favor of Universal Shipping Co., Inc. [hereinafter "Universal"], the United States agent for Venizelos. Such action was taken by Chase upon request of Banco, a correspondent bank of Chase. The confirmed letter of credit stated, *inter alia*, that it was for a sum not exceeding $82,830 payable against presentation of sight drafts accompanied by proper documents, covering ocean freight for the shipment of about 9690 metric tons of scrap; that partial shipments were not permitted; and that its correspondent (Banco) advised that, out of the amount of the credit, $10,000 was to be earmarked for demurrage and $5,000 for indemnity damages. On August 24, Chase advised Venizelos that the credit had been transferred to Venizelos as the new beneficiary and that the original letter of credit had been endorsed accordingly.

The "Anastassis" sailed from Philadelphia for Mexico for her first (and only) voyage under this charter party on September 3, 1965 with what was estimated to be 9915.7 metric tons of scrap; on the same day, the letter of credit was amended to increase the credit by $47,795 to $130,625 to cover " * * * transport expenses, 19,300 tons approximately of Number 1 Heavy Melting Liberty Ship Scrap * * * " to be available with presentation of proper documents including a " * * * copy of a Charter Party clean onboard Bill of Lading S/S Anastassis. * * * " The amendment further stated that the total amount included $10,000 to guarantee damage to the steamer arising from unloading and demurrage; the amendment provided that all other conditions were to remain unchanged. There is no question that on the voyage made, the time consumed in discharging the cargo was in excess of the time allowed under the

charter party (discharging began September 15 and was not completed until October 24, 1965) with the result that the owners were entitled to demurrage. In addition the vessel sustained damage during the loading and discharging of the cargo.

Twelve days after the "Anastassis" sailed, Chase paid $61,973.21 to Venizelos. This followed Venizelos' presentation of a sight draft for that amount based on an estimated 9915.7 metric tons at $6.25 per metric ton accompanied by an invoice and copies of bills of lading. When presented with the documents, Chase cabled Banco and informed it of documents being presented " * * * covering partial shipment 9915 M/T." of cargo; in response Banco cabled Chase and advised, regarding this particular letter of credit, " * * * we agree with documents presented. * * *" Consequently, Chase paid Venizelos the $61,973.21. Two months later, Venizelos presented sight drafts for $624.29 and $10,000. The $624.29 represented the difference between the actual tonnage (as shown by the "Weight Return," certificate of inspection and invoice submitted by Venizelos) of 10015.6 metric tons and the previously estimated tonnage of 9915.7 metric tons; this difference of 99.9 metric tons was charged at the rate of $6.25 per metric ton. The draft for $10,000 was submitted with a Demurrage Statement showing demurrage due of $39,691.67 for the delay in unloading the vessel, a statement of facts for Coatzacoalcos, the port of discharge signed by the port captain, the ship's master and charterer's agent, a lay time statement and a port log; an invoice was also presented to Chase for $10,000 to cover stevedore damages, together with a statement by a qualified surveyor as prescribed by the amendment to the letter of credit. However, since the letter of credit allowed a maximum amount of $10,000 for demurrage and stevedore damage, that was the amount of the draft presented. Chase refused to honor these two drafts, asserting that Venizelos had violated the terms of the letter

of credit insofar as Venizelos had conveyed a partial shipment of 10,015 metric tons rather than the 19,300 tons provided for in the letter of credit and that under the letter's terms, payment was not permitted for partial shipments. The court below dismissed the two causes of action (for the $624.29 and $10,000), granting summary judgment to Chase.

In September, 1966, Venizelos also obtained an arbitration award against Perfiles for $151,332.25; this award was confirmed by the district court, and judgment was entered thereon on January 11, 1967. Later in January, Venizelos caused a writ of execution to be issued directing the marshal to levy against all property and funds of Perfiles held by Chase under the letter of credit; the remaining sum of the letter of credit confirmed by Chase ($68,651.-79) was demanded by Venizelos. However, Chase denied that it had any attachable property of Perfiles and refused to deliver to the marshal the amount sought. The district court also granted summary judgment for Chase on this claim, the basis for the third cause of action. Jurisdiction for all claims was based on diversity of citizenship.

## I. The Claims for $624.29 and $10,000

The letter of credit involved was issued and confirmed by Chase with Venizelos, the amended beneficiary, for the account of Perfiles, at the request of Banco, Perfiles' bank. The primary purpose of such a letter of credit is to provide an assurance to the selling party (here the ship owner's agent Venizelos) of prompt payment against documents, i. e., to provide a method of payment, through banking channels, which defines the terms and conditions upon which and only upon which the payment will be made and which, within the strict limits of those terms and conditions, engages the full primary responsibility of the bank to make the payment. Ordinarily there are three separate and distinct contracts involved in a letter of credit

transaction; the contract of the bank with its customer whereby it agrees to issue the letter of credit, the letter of credit itself and the contract of sale between the buyer who is also the person who procured the bank to issue the letter of credit and the seller who accepts and acts under the letter of credit by drawing drafts thereunder. Except insofar as its terms are expressly incorporated therein, a bank's contract with its customer for a letter of credit in favor of a beneficiary is separate and distinct from the charter party or other contract of sale between the customer and the seller; the letter of credit constitutes the sole contract of the bank with the seller and is completely independent of the other contracts. Kingdom of Sweden v. New York Trust Co., 197 Misc. 431, 96 N.Y.S.2d 779 (1949). See Gilmore and Black, The Law of Admiralty § 3–12 at 105 (1957). Since the bank is interested only in the documents to be presented, the essential requirements of a letter of credit must be strictly complied with by the party entitled to draw against the letter of credit, which means that the papers, documents and shipping descriptions must be as stated in the letter. Anglo-South American Trust Co. v. Uhe, 261 N.Y. 150, 184 N.E. 741 (1933); accord: Marine Midland Grace Trust Co. of New York v. Banco Del Pais, S.A., 261 F.Supp. 884 (S.D.N.Y.1966).

█ Chase is a confirming bank in this case, see New York Uniform Commercial Code, § 5–103 (1) (f); cf. Bril v. Suomen Pankki Finlands Bank, 199 Misc. 11, 97 N.Y.S.2d 22, 34 (Sup.Ct. 1950), and accordingly has all the duties and rights of a confirming bank. See New York Uniform Commercial Code, § 5–107(2). Thus Chase added its own liability to that of the issuing bank, undertook to honor the drafts and was directly obligated as though it were the letter's issuer to the extent of its confirmation. New York Uniform Commercial Code, § 5–107(2); see Gilmore and Black, *supra*, § 3–17 at 111 fn. 96.

█ The beneficiary of a letter of credit is bound to comply with its terms and conditions; in the absence of such compliance, there would be no liability on the part of the issuing or confirming bank. North Woods Paper Mills v. National City Bank, 121 N.Y.S.2d 543 (1953), aff'd, 283 App.Div. 731, 127 N.Y.S.2d 663 (1954). In this case, the district court found that Venizelos had not complied with the terms since it had shipped only a partial shipment and payment was not allowed for this. That ruling was premised upon interpreting the amendment to the letter of credit providing for an increased amount of credit to cover transport expenses for 19,300 tons as meaning that anything less than 19,300 tons was a partial shipment and finding that the initial payment of $61,973.21 by Chase after the exchange of telegrams with Banco would not estop Chase from asserting that the 9915 or 10,015 tons was a partial shipment. We do not agree.

█ There is no question but that Venizelos and Perfiles meant and provided for the revolving letter of credit to cover the freight for two voyages; that is precisely what clause 47 of the charter party required, i. e., that a revolving letter of credit be established to cover the minimum freight for two voyages and each voyage was estimated at 9500 deadweight tons (9650 metric tons), thereby indicating the transport expenses for 19,300 metric tons would be the equivalent of two voyages. Moreover, even the amended letter of credit considered independently, requires reversal of the summary judgment on the first two claims. A construction that will sustain an instrument will be preferred to one that will defeat it; Ga Nun v. Palmer, 216 N.Y. 603, 111 N.E. 223 (1916); accord: Silverman v. Alpart, 282 App.Div. 631, 125 N.Y.S.2d 602 (1953); if an agreement is fairly capable of a construction that will make it valid and enforceable, that construction will be given it. M. O'Neil Supply Co., Inc. v. Petroleum Heat & Power Co., 280 N.Y. 50, 19 N.E.2d 676 (1939). The same general principles which apply to other contracts in writing govern letters

of credit. Fair Pavilions, Inc. v. First Nat'l City Bank, 24 A.D.2d 109, 264 N.Y.S.2d 255 (1965), rev'd on other grounds, 19 N.Y.2d 512, 281 N.Y.S.2d 23, 227 N.E.2d 839 (1967). Where a letter of credit is fairly susceptible of two constructions, one of which makes it fair, customary and one which prudent men would naturally enter into, while the other makes it inequitable, the former interpretation must be preferred to the latter, and a construction rendering the contract possible of performance will be preferred to one which renders its performance impossible or meaningless. See Liberty Nat'l Bank & Trust Co. v. Bank of American Nat'l Trust & Savings Ass'n, 218 F.2d 831, 840 (10 Cir. 1955). Moreover, as between the beneficiary of a letter of credit and the issuer (or in this case, Chase, since confirmers are to be treated as issuers under New York commercial law) if ambiguity exists, the words are taken as strongly against the issuer as a reasonable reading will justify. Lamborn v. National Park Bank of New York, 212 App.Div. 25, 208 N.Y.S. 428 (1925), aff'd 240 N.Y. 520, 148 N.E. 664.

▮▮▮ If the requirement of total shipment were interpreted to mean 19,-300 tons as Chase claims, the letter of credit would be meaningless since Venizelos could not transport that amount in one voyage on its liberty ship "Anastassis"; however, if a total shipment were said to be 9690 tons as stated in the original letter of credit, the contract would be reasonable and possible to perform. The letter of credit called for the shipment of about 9690 metric tons, and the amendment provided that all other terms, not amended, were to remain in effect. The amendment referred to the increase in credit being for transport expenses of 19,300 tons of Liberty ship scrap but did not refer to that amount as being one shipment. Any ambiguity here is to be resolved against Chase, the author of the amendment. Thus not only did the phrase " * * * partial shipments are not permitted" survive but so did the phrase calling for ship-

ment of about 9690 metric tons. Any remaining question that the lower tonnage was to be considered a total shipment is answered by the other facts shown. The letter from Chase to Venizelos regarding the assignment to Venizelos as beneficiary of the letter of credit acknowledges that transportation was to be on the "Anastassis," a Liberty ship, and the amendment referring to transport expenses of 19,300 also specifies the "Anastassis." Liberty ships typically carry approximately 9650 metric tons in a load. When presented with the proper documents and a sight draft for $61,973.21, Chase cabled its correspondent bank, Banco, and queried as to what to do since the documents presented were for 9915.7 tons (the estimated amount). Banco cabled back approving the documents presented, and Chase paid Venizelos. When Chase paid this amount, Venizelos reasonably assumed that Chase would honor its obligations under the letter of credit, including demurrage and stevedore damages, with respect to that voyage and acting in reliance on that view, allowed unloading operations in Coatzacoalcos to commence. Since Venizelos acted in reliance and to its detriment, by allowing the goods to be discharged, on Chase's original payment of $61,000, Chase is estopped from asserting that the shipment was a partial one. In any event, after Banco cabled its agreement with the documents presented for 9915 tons, if Chase had any lingering doubts as to what was a "partial shipment" with reference to the vessel specified in the amendment to the letter of credit, prudence would have dictated that it inquire further. Had Chase done so, it would have been clear that the correct construction of the letter was to prohibit, as partial shipments, shipments of less than 9690 metric tons; this is the only reasonable construction to be given to the terms of the amended letter of credit under the circumstances presented.

▮▮▮ Since Venizelos presented the proper documents requiring payment and since the contract should be inter-

preted as allowing no shipments less than 9690 metric tons, Venizelos is entitled to recover summary judgment on its claims for additional freight and demurrage and stevedore damages. As stated previously, the freight was 99.9 tons more than what was estimated, charged at the specified rate of $6.25 per ton, totaling $624.29. Venizelos is also entitled to collect the $10,000 maximum set aside in the letter of credit for demurrage and stevedore damages, since documents were presented showing justified claims well in excess of $10,000 for these two items. Although the charter party between Venizelos and Perfiles apparently only contemplated originally that $5,000 of the credit amount in the letter of credit would be for stevedore damages and/or demurrage, we must interpret the letter of credit as a separate and independent contract between Chase and Venizelos. Kingdom of Sweden v. New York Trust Co., *supra*. In the original letter of credit confirmed by Chase, $10,000 was earmarked for demurrages and an additional $5,000 was earmarked for indemnity damages; this was at a time when the total amount of the credit was $82,830 representing freight of 9690 tons at $7.00 per ton, plus the additional $15,000. Thus these amounts would appear to have been earmarked to cover one voyage. The amendment actually decreased the aggregate limitation for demurrage and stevedore damages to $10,000 but gives no indication that while increasing the freight amount to cover two voyages (19,300 tons at $6.25 per ton, i. e. $120,625.00) the $10,000 was meant to cover two voyages. Although the parties might have specified a particular limitation per voyage, they did not. It would be unreasonable to infer that the parties would have decreased the aggregate limitation and yet increased its coverage to two voyages without some specific indication that such was their intent. Since, as between the confirming bank and the beneficiary of a letter of credit, if an ambiguity exists, in construing the letter the words should be taken as strongly

against the bank as is reasonably justified, the maximum limitation of $10,000 for demurrage and indemnity damages is to be interpreted as meant for each voyage, and Venizelos is entitled to summary judgment for the $10,624.29 sought.

## II. Claim for $68,051.79

Venizelos made an additional claim for the remainder of the amount of the letter of credit, $68,051.79 ($130,625.00 less the $61,973.21 already paid); however, this claim is unsubstantiated as against Chase. Venizelos obtained an arbitration award against Perfiles for more than $150,000 and attempted to levy against Chase for the remaining funds in the letter of credit confirmed by Chase. Venizelos made a vague claim that Chase had funds belonging to Perfiles, but no supporting evidence was presented; there is no evidence that Perfiles had an account on deposit with Chase. Perfiles was a client of Banco, but it was Banco that had its own funds on deposit with Chase, a correspondent bank. Under the credit arrangement between Chase and Banco, Chase could reimburse itself for payments made under the letter of credit by recourse to Banco's account with Chase; however, that does not mean that the funds belonged to Perfiles. The funds of Banco on deposit with Chase were not specifically set aside or earmarked as security for the letter of credit. In essence, Venizelos attempts to turn the letter of credit into an asset unconditionally securing Perfiles' obligations to it, but a letter of credit functions as a security only to the extent that its specific conditions are performed. The only conditions satisfied involved the first and only voyage for which the required documents were presented and payment made (or will be made pursuant to Part I of this opinion). Since the conditions required to be performed for Chase to be obligated on the letter of credit beyond the amount due for expenses on the first voyage had not been performed, Chase was not obligated on the letter of

credit beyond the additional $10,624 concerning that initial voyage. Chase has been shown to hold no other asset of Perfiles, and the letter of credit could not be considered an asset in regard to the remaining $68,051.79 until the conditions for payment had been properly performed. Summary judgment was properly granted Chase on this claim since no asset of Perfiles was held by Chase.

Reversed for entry of judgment in favor of appellant on the first two claims in the amount of $10,624.29 with interest at the legal rate from November 15, 1965 and costs; otherwise affirmed.