**EAST GIRARD SAVINGS ASSOCIA-TION, Plaintiff-Appellee,**

v.

**CITIZENS NATIONAL BANK AND TRUST COMPANY OF BAYTOWN, Defendant-Appellant.**

No. 77-1573.

United States Court of Appeals, Fifth Circuit.

April 18, 1979.

**600**

Daniel P. Elkins, Baytown, Tex., for defendant-appellant.

Stephen Philbin, Nathan L. Hecht, Dallas, Tex., Robert H. Singleton, Houston, Tex., for plaintiff-appellee.

Before JONES, CLARK and GEE, Circuit Judges.

CHARLES CLARK, Circuit Judge:

Citizens National Bank and Trust Company of Baytown appeals a district court order holding that it wrongfully dishonored a letter of credit issued to the East Girard Savings Association. We affirm the district court's ruling on the merits of the controversy, but reverse an award of attorney's fees to East Girard.

Frank Thielen and the La Vista Construction Company entered into a joint venture to build the La Vista Apartment Project in McAllen, Texas. The East Girard Savings and Loan Association agreed to provide financing to be insured by the Federal Housing Administration. As a condition of its participation, the FHA required that the joint venturers establish a Completion Assurance Fund to ensure completion of the project and to protect East Girard against losses. Pursuant to this requirement, Thielen asked the Citizens National Bank and Trust Company of Baytown, which had provided financing for some of Thielen's other projects, to provide him with an unconditional letter of credit in the amount of $55,034.00. Citizens issued Thielen a letter of credit prepared by typing on a printed form supplied by the Bank. The instrument provided:

> We hereby establish our irrevocable letter of credit in your favor for account of La Vista Construction Co. up to the aggregate amount of $55,034.00 available by your drafts drawn at sight on us and accompanied by documents specified below covering invoice value of merchandise to be described in invoice as:

Project # 115–44050 LDP

Thielen paid Citizens $3,302.04 for issuing the letter of credit and agreed to reimburse Citizens for any amount paid under the letter of credit.

The original letter expired on August 16, 1972, but Citizens agreed to extend it on four subsequent occasions. The last extension was to expire on August 18, 1973. On August 17, 1973, Citizens refused to honor the letter of credit when East Girard's agents presented it, contending that East Girard had failed to comply with the terms of the letter of credit requiring presentation of evidence that some obligation of the Project was in default.

Thielen and La Vista Construction Company were subsequently discovered to be insolvent, but still owing $56,000 in unpaid bills on the Project. East Girard could not provide the FHA insured permanent financing until the bills were paid. La Vista Associates, the owner of the Project, and the Lumberman's Investment Corporation, parent corporation of the Loper Mortgage Company, East Girard's servicing agent for the financing, agreed to pay the Project's unpaid bills in return for East Girard's promise that they would be reimbursed out of any proceeds recovered in an action against Citizens Bank for wrongful dishonor of the letter of credit. At the end of the trial on East Girard's action, the district court entered judgment in favor of East Girard.

Citizens presents three arguments in urging reversal of the district court's decision. Citizens first contends that the letter of credit unambiguously required that East Girard show that the La Vista Project was in default prior to drawing on the letter of credit. Second, Citizens urges that even if the terms of the letter of credit were ambiguous, proof of default should be required because the parties intended to require it. Third, Citizens asserts that East Girard is not entitled to recover for Citizens' wrongful dishonor of the letter since East Girard did not prove that it had suffered any damages as a result of that dishonor.

Before we turn to the merits of Citizens' arguments, it is appropriate to examine briefly the main features and uses of letters of credit. The Uniform Commercial Code defines a letter of credit as

> an engagement by a bank or other person made at the request of a customer and of a kind within the scope of this chapter (Section 5.102) that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit.

2 Tex.Bus. & Com.Code Ann. § 5.103(a)(1) (Tex. UCC) (Vernons 1968). Letters of credit were originally used to facilitate international transactions involving sales of merchandise by assuring payment for the goods. *Pringle-Associated Mortgage Corporation v. Southern National Bank,* 571 F.2d 871, 874 (5th Cir. 1978); *Venizelos, S.A. v. Chase Manhattan Bank,* 425 F.2d 461, 464 (2d Cir. 1971); Harfield, *Letters of Credit and Documentary Drafts,* 1 U.C.C. L.J. 205, 206 (1969). In a typical transaction, a seller in a distant country might wish to sell some goods to a buyer whose credit he did not trust. In order to ensure that the goods would be paid for, the seller could require the buyer to procure a letter of credit which would provide that upon presentation of certain documents—normally bills of lading or air freights receipts—evidencing title to the goods, the seller could draw on the letter of credit. The issuing bank would then take a security interest in the goods and deliver the title documents to the buyer, who would be obligated to repay the amount drawn on the letter of credit. J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code, § 18–1 (1972); Verkuil, *Bank Solvency and Guaranty Letters of Credit,* 25 Stan.L.Rev. 716, 717–21 (1971).

As is apparent from this example, a letter of credit typically involves three separate contracts. First, the issuing bank enters into a contract with its customer to issue the letter of credit. Second, there is a contract between the issuing bank and the party receiving the letter of credit. Third, the customer who procured the letter of credit signs a contract with the person receiving it, usually involving the sale of goods or the provision of some service. *Barclays Bank D.C.O. v. Mercantile National Bank,* 481 F.2d 1224, 1239 n.21 (5th Cir. 1973), *cert. dismissed,* 414 U.S. 1139, 94 S.Ct. 888, 39 L.Ed.2d 96 (1974); Verkuil, *supra,* 25 Stan.L.Rev. at 719.

In recent years, letters of credit have been used for a variety of commercial transactions. Harfield, *The Increasing Domestic Use of the Letter,* 4 U.C.C.L.J. 251 (1972). The guaranty letter of credit is one of these recent innovations. The guaranty letter of credit is designed to ensure that one or more parties to a contract will perform their duties under it. In a typical guaranty situation, the future owner of a building requires that the building contractor give him a completion bond providing for the payment of a certain sum of money if the building is not completed on schedule. In order to fulfill this requirement, the contractor procures a letter of credit stating that upon the contractor's failure to perform on schedule, the bank will pay a draft drawn on the letter of credit. The bank in return receives an agreement from the contractor that he will reimburse it for any expenditure made under the letter. Verkuil, *supra,* 25 Stan.L.Rev. at 721–24; *see First Empire Bank v. Federal Deposit Insurance Corp.,* 572 F.2d 1361, 1366–67 (9th Cir. 1978); *Bank of North Carolina, N. A. v. Rock Island Bank,* 570 F.2d 202, 206 & n.7 (7th Cir. 1978).

The conditions contained in letters of credit vary widely, depending upon the nature of the underlying transaction. A "documentary" letter of credit requires that a draft on the letter of credit be accompanied by some document, such as a document of title or a certificate of default. A "clean" letter of credit is payable merely upon the presentation of a draft; no accompanying documents are necessary. White & Summers, *supra,* § 18.1 at 606; Note, *Guaranty Letters of Credit: Problems and Possibilities,* 16 Ariz.L.Rev. 823, 824 n.19 (1974); *see* 2 Tex.Bus. & Com.Code Ann. § 5.103(a)(2) & comment 2 (Tex. UCC) (Ver-

nons 1968). Regardless of which form of letter of credit is used, upon compliance with the conditions contained in the letter, the recipient is entitled to full payment. This entitlement is independent of collateral obligations which may exist under the other underlying contracts. *Pringle-Associated Mortgage Corp., supra,* 571 F.2d at 874; *Barclays Bank, supra,* 481 F.2d at 1238–39; 2 Tex.Bus. & Com.Code Ann. § 5.114, comment 1 (Tex. UCC) (Vernons 1968). Thus, even if the producer of the letter has a valid defense on his contract with the recipient of the letter, the bank cannot assert it. *Pringle-Associated Mortgage Corp., supra,* 571 F.2d at 874. If, for example, the goods that the letter of credit was issued to finance are shoddy, the bank still must pay on the letter of credit once the conditions contained in it are met. *Asociacion de Azucareros de Guatemala v. United States National Bank of Oregon,* 423 F.2d 638 (9th Cir. 1970); 2 Tex.Bus. & Com.Code Ann. § 5.114(a) (Tex. UCC) (Vernons 1968).

■ Citizens asserts that the letter of credit here was documentary and required that documents showing La Vista's default accompany a draft. The district court held that the portion of the letter of credit specifying the documents necessary to accompany a draft was ambiguous and that, since Citizens drafted the letter, the ambiguity should be resolved against it and no accompanying documents should be required. We agree. As the district court noted, the central problem with the letter of credit here is that Citizens attempted to draft a guaranty letter of credit on a form designed for a letter of credit involving a sale of merchandise. The use of the wrong form makes the attempt to specify required accompanying documents meaningless. The letter of credit in question stated that a draft must be accompanied "by documents specified below covering invoice value of merchandise to be described in invoice as: Project # 115–44050 LDP." As Citizens must have realized when it issued the letter of credit, the Project was not "merchandise" nor would there be a single invoice covering the entire Project. The building of an apartment complex requires the acquisition of building materials, the hiring of laborers, and the employment of subcontractors to build the building. Numerous invoices are necessarily involved. Yet the letter of credit nowhere specified which of those invoices had to accompany a draft. The terms of the letter of credit bore no meaningful relevance to this transaction and were therefore ambiguous.

■ Any ambiguity in a letter of credit must be resolved against the party drafting it. *Bank of North Carolina, N. A. v. Rock Island Bank,* 570 F.2d 202, 207 (7th Cir. 1978); *Bossier Bank & Trust v. Union Planters National Bank,* 550 F.2d 1077, 1082 (6th Cir. 1977); *Venizelos, S. A. v. Chase Manhattan Bank,* 425 F.2d 461, 466 (2d Cir. 1970). Citizens attempts to escape this rule of construction by arguing that the parties intended that Citizens be liable on the letter of credit only if proof of La Vista's default were presented. We reject this argument. An issuer's liability on a letter of credit is controlled solely by the terms of that letter. *Courtaulds North America, Inc. v. North Carolina National Bank,* 528 F.2d 802, 805–06 (4th Cir. 1975); *Dulien Steel Products v. Banker's Trust Co.,* 298 F.2d 836, 840 (2d Cir. 1962).

■ As we noted above, the bank must pay when the terms of the letter of credit are fully complied with. Thus, a bank must use the utmost care in drafting its letters of credit.[1] *See* Note, *supra,* 16 Ariz.L.Rev. at 846–848. Banks are presumed to be cogni-

---

1. This is particularly true when a bank issues a guaranty letter of credit. When a letter issued to assure payment for merchandise is drawn upon, the bank usually takes a security interest in the goods being purchased, and is thus protected from the buyer's insolvency. On the other hand, guaranty letters of credit are normally conditioned only upon proof that the procure of the letter is in default; the bank receives nothing of value when it pays on the letter. This distinction has prompted one commentator to note that a guaranty letter of credit "should be considered a loan to a customer as soon as it is opened." Verkuil, *supra,* 25 Stan. L.Rev. at 723.

zant of prevailing commercial practices in transacting their business. *Barclays Bank, supra,* 481 F.2d at 1235. When a bank eschews those practices, it does so at its own peril.[2] If Citizens desired that it be liable only upon La Vista's default, it should have made default an express condition of the letter of credit. Citizens' only remedy now is against Thielen. The district court here correctly held that East Girard complied with the terms of the letter and that Citizens' refusal to honor the letter was wrongful.

■ Citizens contends that East Girard should not recover for wrongful dishonor of the note since East Girard did not prove it suffered any damages as a result of that dishonor. In making this argument, Citizens relies on Tex.Bus. & Com.Code Ann. § 5.115(a) (Tex. UCC) (Vernons 1968), which provides:

> When an issuer wrongfully dishonors a draft or demand for payment presented under a credit the person entitled to honor has with respect to any documents the right of a person in the position of a seller (Section 2.707) and may recover from the issuer the face amount of the draft or demand together with incidental damages under Section 2.710 on seller's incidental damages and interest but less any amount realized by resale or other use or disposition of the subject matter of the transaction. In the event no resale or other utilization is made the documents, goods or other subject matter involved in the transaction must be turned over to the issuer on payment of judgment.

Citizens urges that this provision of the Texas U.C.C., although not directly on point, establishes a policy that a beneficiary's damages for wrongful dishonor should be limited to out-of-pocket losses because, under the U.C.C., a beneficiary under a letter of credit concerning a sale of goods is not entitled to damages if the

amount he receives on resale of the goods exceeds the face value of the letter of credit plus incidental damages. White & Summers, *supra,* § 18–6 at 627–28.

Citizens also asserts, as an alternative to the U.C.C. remedy, that the measure of damages used in ordinary contract cases should govern actions for wrongful dishonor of letters of credit. The purpose in awarding damages for breach of an ordinary contract is to put the wronged party in the position he would have been in had the contract been performed. Thus, if that party actually gains because of the breach, he cannot recover damages. 5 Corbin on Contracts § 992 (1964).

We reject Citizens' arguments and hold that East Girard is entitled to recover the face value of the letter. The measure of damages used in ordinary contract cases is inapplicable because a letter of credit simply is not an ordinary contract. The letter of credit is a unique device developed to meet specific needs of the marketplace. If the letter of credit is to retain its utility as a commercial instrument, the rights and duties of the issuer, the beneficiary, and the procurer must remain clear. Parties to commercial transactions must be able to rely on the fact that as soon as the conditions contained in a particular letter are satisfied, payment is due. Allowing an issuer to dishonor a letter merely because the beneficiary cannot show any damages would undermine the certainty of payment that makes letters of credit so appealing to persons engaged in commerce.

■ The U.C.C. remedy provisions are also inapplicable in this situation. As we have noted above, the obligations arising from a letter of credit are independent of the underlying contracts. The U.C.C. provision requiring the deduction of the amount received on resale of the goods from the beneficiary's damages is in no way incon-

---

**2.** As we stated in *Barclays Bank, supra,* 481 F.2d at 1235:

> Barclays is entitled to assume that when dealing with another bank in a commercial undertaking that bank is competent to conduct its own affairs. . . . Having em-

ployed words which give of but one meaning in the community of their use [that bank] cannot escape the legal liability flowing from the use of those words by the assertion that it did not use them as they are commonly understood in banking circles.

**604**

sistent with this rule. A letter of credit involving a sale of goods almost always requires that title documents to the goods accompany a draft. Upon dishonor, the wronged party ordinarily sells those goods to recoup the loss. White & Summers, *supra*, § 18–6 at 627. Thus, since the goods resold are specifically mentioned in the letter of credit, the court need not look to the underlying contracts to determine which goods are involved. Moreover, since the goods are identified, determining the amount by which the beneficiary's damages should be reduced is an easy task.

An extension of the U.C.C. rule to require proof of actual damages here would, however, mandate an inquiry into the rights and liabilities established by the underlying contracts. If Citizens' arguments were accepted, the court here would have to examine the contract between the joint venturers and the builders to determine the extent of La Vista's default and the status of contract affairs between the joint venturers and East Girard to determine the extent of East Girard's injury as a result of that default. Any requirement that this inquiry be made would be contrary to the purposes which letters of credit were designed to serve. In addition, damages resulting from the dishonor of guaranty letters of credit will be often difficult, if not impossible, to assess. The underlying contracts in such situations could be so complex that the cost of an attempt to prove damages on wrongful dishonor could actually exceed the face value of the letter. *See* Note, *supra*, 16 Ariz.L.Rev. at 845 n.144.

■ Citizens also contends that since East Girard's pleadings alleged that East Girard had been damaged by Citizens' wrongful dishonor, East Girard was required to prove it actually suffered damages in order to recover. This argument is without merit. We have long since abandoned the hypertechnical rules that re-

quired a party to plead at his peril. *See* Federal Rule of Civil Procedure 8(a); C. Wright, Handbook of the Law of Federal Courts § 66 (1976). East Girard's pleadings here were sufficient to inform Citizens that it was filing suit for the face value of the note. Nothing more was necessary.

■ Citizens alleges that the district court erred in awarding East Girard $5,200 in attorney's fees. We agree. The district court relied on the section of the U.C.C. providing for recovery of a seller's incidental damages.[3] That statute does not expressly mention attorney's fees as a recoverable item. Texas follows the rule that attorney's fees are not recoverable unless the underlying contract provides for their recovery or there is a statute permitting them to be awarded. *Transamerica Insurance Co. v. Red Top Metal, Inc.*, 384 F.2d 752, 757 (5th Cir. 1967); *Bray v. Curtis*, 544 S.W.2d 816, 820 (Tex.Civ.App.—Corpus Christi 1976, writ ref'd n. r. e.). We conclude that the Texas legislature, in adopting the U.C.C. section on incidental damages, did not intend to alter the long-standing Texas rule against the award of attorney's fees. *See Bossier Bank & Trust Co. v. Union Planters National Bank*, 550 F.2d 1077, 1081–82 (6th Cir. 1977). Since the letter of credit here did not provide for recovery of attorney's fees and since no statutory provision awards them, we reverse the award here.

AFFIRMED IN PART and REVERSED IN PART.

---

**3.** 1 Tex.Bus. & Com.Code Ann. § 2.710 (Tex. UCC) (Vernons 1968) provides:

Incidental damages to an aggrieved seller include any commercially reasonable charges, expenses or commissions incurred

in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach.