EXXON COMPANY, U.S.A., A DIVISION OF EXXON CORPORATION, Plaintiff-Appellee Cross-Appellant,

v.

BANQUE de PARIS et des PAYS–BAS, Defendant-Appellant Cross-Appellee.

No. 87–2007.

United States Court of Appeals, Fifth Circuit.

Oct. 8, 1987.

Stanley Godofsky, Donald F. Luke, Kenneth L. Miller, Rogers & Wells, New York City, Hayden Burns and Constance Barnes, Butler & Binion, Houston, Tex., for defendant-appellant.

Michael F. Crotty, Associate Gen. Counsel, American Bankers Ass'n, Washington, D.C., for amicus-American Bankers Assn.

Rufus Wallingford and Tom A. Cunningham, Fulbright & Jaworski, Houston, Tex., for plaintiff-appellee.

Before RUBIN, GARZA, and JOLLY, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

Standby letters of credit are issued by banks to assure the prompt payment of money to a party to another contract in the event that the other contract is not performed in accordance with its terms. The issuing bank is required to make payment only if it is presented with specified documents. The function of letters of credit requires that they be succinct and clear, for their utility lies in the assurance they provide that payment will be made on the specified terms without delay or litigation.

In this action for the wrongful dishonor of a letter of credit on which payment was demanded after the stated expiry date of the credit, we find that the obligation of the issuing bank had terminated even though it might not have been possible to present to the bank the documents required for payment before the expiry date. We therefore reverse the district court judgment holding the bank liable.

I.

In July 1981, Houston Oil & Refining, Inc. entered into a contract with Exxon Company, U.S.A., under which Exxon would deliver 558,000 barrels of crude oil to Houston in July and Houston would deliver an equal quantity of crude oil to Exxon *"during* September through December 1981."  Exxon made this trade because it had closed part of one of its refineries for maintenance and therefore had a surplus of crude oil. The contract required Houston to provide an irrevocable standby letter of credit to cover the value of the oil delivered by Exxon. It stated that the letter of credit was to be payable to Exxon "on presentation of invoices or [a] statement of an officer of Exxon certifying that invoices are unpaid and past due ten (10) days or more."

Houston then applied to Banque de Paris et des Pays-Bas, also known as Paribas, for a letter of credit in the amount of $19,530,-000. In its application, Houston stated that the letter of credit was to be payable upon presentation of specified invoices; pipeline tickets or transfer statements; and a

> [s]tatement signed by an authorized representative certifying that Houston Oil & Refining, Inc. *has failed to deliver* to Exxon Company, U.S.A. 558,000 barrels of one of the following: South Louisiana to St. James, La., West Texas Sour to Shell, McCamey or Exxon, Crane, Arab Light to U.S. Gulf Coast or Alaskan North Slope to U.S. Gulf Coast *between September and December, 1981.*[1]

The application also expressly requested that the letter of credit expire on October 31, 1981.

Because the transaction was in effect an extension of credit to Houston, Paribas required Houston to provide security sufficient to cover the amount of the credit, and, as part of the security arrangement, the bank blocked certain funds coming into Houston's account. In addition, Paribas charged Houston a fee of $53,000 for establishing the credit.

On July 16, 1981, Paribas "opened" the credit by telex and delivered a copy of it to Exxon as requested by Houston. The credit stated that it was to be paid against the documents specified in the application, and that these documents "must be presented

---

1. Emphasis added.

not later than October 31, 1981." Because October 31 would be a Saturday, the documents could also be presented on the next business day, Monday, November 2.[2] The credit also stated that it was subject to the 1974 revision of the Uniform Customs & Practice for Documentary Credits, a set of rules promulgated by the International Chamber of Commerce.[3]

Because the letter expired *on October 31,* yet covered deliveries *between September and December,* Paribas checked with Houston twice—both before and after issuing the letter—to make sure that the terms specified by Houston in its application were indeed what it had intended. Before the letter was issued, Flozella Telfair, the Paribas employee who dealt with the application, noted the apparent inconsistency and communicated with Houston. Upon receiving Houston's affirmation that the terms were correct, Telfair drew circles on the application around both the October 31 expiration date and the September-December period specified for delivery, and next to these terms made the notation "OK as per HOR and R.P." (HOR was Houston, and R.P. was Rene Perdreaux, a Paribas lending officer responsible for the Houston account.) Subsequently, after the letter had been issued, Hal Peist, a letter of credit professional at Paribas, discussed its terms with Robert Wheelock at Houston and asked whether a change in the expiration date was desired. Wheelock responded negatively.

When the credit was opened, Paribas sent a copy of the letter to the attention of Don Meiers, the Exxon employee responsible for receiving and transmitting letters of credit and monitoring their expiration dates. Meiers received the letter of credit and transmitted it to the appropriate executives at Exxon with a letter stating that it "is due to expire October 31, 1981." Meiers' transmittal letter also noted that the credit covered the delivery of crude oil by Exxon during July and "the return" of the

crude by Houston "between September and December 1981." No one at Exxon complained or even suggested that these terms were not fully satisfactory.

Exxon was an experienced trader of crude oil. It commonly balanced its crude oil supply by entering into exchanges and, unless it was dealing with a major oil company, secured those exchanges by receiving letters of credit issued in its favor. Exxon knew from its experience that it could insist on the amendment of unsatisfactory letters of credit, and it followed the practice of delaying the delivery of crude oil to its trading partners until it had actually received a satisfactory letter.

Houston made no delivery of crude oil to Exxon during September or October of 1981. Before October 31, Meiers brought the problem of Exxon's exposure to loss under the exchange contract to the attention of higher management at Exxon. Exxon asked Houston to obtain an extension of the letter of credit, but did not communicate with Paribas. On October 30, Joe Imparato, the president of Houston and a former Exxon employee, said that he would extend the letter of credit on Monday, November 2; however, he did not do so. When Imparato visited Exxon during the week of November 2, he stated that Houston would not be able to return the crude oil under the contract, and asked whether Exxon would be willing to convert Houston's obligation into a long term debt. Exxon's representatives told Imparato that such an arrangement would be unsatisfactory, and that they would insist on performance as required by the contract.

During November, Paribas released both the security that it had held for its extension of credit to Houston and the funds that it had blocked in Houston's account. Subsequently, on November 30 and on December 1, Exxon attempted to obtain payment by presenting documents to Paribas.

---

**2.** Tex.Bus. & Com.Code Ann. § 3.503(c) (Vernon 1968); Uniform Customs & Practice for Documentary Credits art. 39, para. a, Int'l Chamber of Commerce Pub. No. 290 (1974 rev), *reprinted in* H. Harfield, *Letters of Credit* 135, 154 (1979).

**3.** International Chamber of Commerce Pub. No. 290, *reprinted in* H. Harfield, *Letters of Credit* 135 (1979) [hereinafter cited as *Uniform Customs*].

Paribas rejected both presentations as untimely.

## II.

The district court found a "clash" between the expiry date in the letter and the dates specified for performance of the underlying contract. It held, however, that the letter of credit was not ambiguous because its meaning could be made certain "by application of the rules of [contract] construction." The court resolved the "inconsistency" in part by interpreting the letter of credit against its author, the bank—a rule of construction that generally applies only to clarify ambiguity [4]—and by reading the letter in such fashion as to make performance possible. The court thus construed the contract "in favor of Exxon" and, extending but not defining the expiry date, entered summary judgment in Exxon's favor.

## III.

A letter of credit "means an engagement by a bank ... made at the request of a customer ... that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit." [5] The purpose of a standby letter is to insure that one or more parties to a contract will perform their duties under it.[6] The credit substitutes a known, accessible, and demonstrably impeccable source of funds in the event of default by the party whose performance it guarantees. Letters of credit facilitate commercial transactions, particularly in international commerce, by assuring certainty in application, consistency in interpretation across jurisdictional boundaries, and swiftness in execution. By eliminating credit risks, they reduce the cost of commercial transactions.

■ The transaction involves three separate contracts: The first one is the underlying commercial contract between two parties, one of whom will later apply to a bank for the letter, and the other of whom will be the beneficiary of the letter. The terms of this contract may not become known to the bank. The second contract is between the issuer of the letter of credit—typically a commercial bank—and its customer, who in applying for the letter asks the bank to draft the letter in conformance with specified terms. The third contract, the letter of credit itself, is between the issuer and the beneficiary.[7] The issuer unconditionally and irrevocably binds itself to pay a specified sum upon presentation of documents complying with the terms of the credit. The issuer's obligation to pay the beneficiary is generally independent of any obligation of the issuer's customer to the beneficiary,[8] and the issuer has no obligation to pay unless the beneficiary strictly complies with the conditions contained in the credit.[9] An issuer who makes payment upon a presentation that does not conform to the requirements of the credit loses its right to repayment from its customers.[10]

A letter of credit is therefore strictly construed.[11] The issuer is required to act in good faith and to observe any general banking usage, but is not charged with responsibility for knowledge or lack of knowledge of any usage of the trade in which the customer and beneficiary are

---

**4.** *See Richland Plantation Co. v. Justiss-Mears Oil Co.,* 671 F.2d 154, 156 (5th Cir.1982); *Chevron Oil Co. v. E.D. Walton Constr. Co.,* 517 F.2d 1119, 1122 (5th Cir.1975).

**5.** Tex.Bus. & Com.Code Ann. § 5.103(a)(1) (Vernon 1968).

**6.** *East Girard Sav. Ass'n v. Citizens Nat'l Bank & Trust Co.,* 593 F.2d 598, 601 (5th Cir.1979).

**7.** *See East Girard Sav. Ass'n,* 593 F.2d at 601; *Sisalcords do Brazil, Ltd. v. Fiacao Brasileira de Sisal, S.A.,* 450 F.2d 419, 422 (5th Cir.1971), *cert. denied,* 406 U.S. 919, 92 S.Ct. 1771, 32 L.Ed.2d 118 (1972); *Republic Nat'l Bank v. Northwest Nat'l Bank,* 578 S.W.2d 109, 112 (Tex.1978).

**8.** J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* 711–12 (2d ed. 1971).

**9.** *Venizelos, S.A. v. Chase Manhattan Bank,* 425 F.2d 461, 464–65 (2d Cir.1970); *see also Republic Nat'l Bank,* 578 S.W.2d at 114–15.

**10.** *Philadelphia Gear Corp. v. Central Bank,* 717 F.2d 230, 236 (5th Cir.1983).

**11.** H. Harfield, *supra,* at 36.

involved.[12]  It must determine whether to make payment to the beneficiary "on the basis of the documents [presented to it] alone."[13]

A half century ago, when a particular letter of credit did not specify an expiration date, courts required that necessary documents be presented to the issuing bank "within a reasonable time."[14]  Eventually, that formulation proved to be commercially unsatisfactory because it left a bank's obligation uncertain and open-ended.  To solve this problem, the International Chamber of Commerce adopted the Uniform Customs & Practice for Documentary Credits.  Article 37 of the *Uniform Customs* requires all letters of credit made subject to it to stipulate an expiry date.  Paribas' letter of credit expressly incorporated by reference the *Uniform Customs,* and therefore by necessity stated a specific termination date.

The need for a precise expiration date is particularly acute when a standby letter of credit is issued.  Although such a credit is different from a surety bond or a guaranty, it does assure payment in the event the account party fails to perform an underlying contract with the beneficiary, the terms of which may be unknown to the issuer.  The standby credit is therefore an extension of a bank's credit to its customer and, for this reason, it is subject to the statutory and regulatory loan limits imposed upon lending institutions.[15]  Because the issuer of a standby credit does not hold documents representing goods in a commercial transaction, it cannot look to those documents as security for repayment by its customer.[16]  Therefore, the issuer must look solely to the financial strength of its customer and to whatever security it has required for issuance of the credit.  The length of time that an issuer remains liable for a failure to perform by its customer is obviously a matter of critical importance to the issuing bank, to the customer who must pay for the credit, and to the regulatory authorities that monitor the bank's activities.[17]  Good banking practice and common sense require that the bank's liability terminate at a date certain.

### IV.

The issue before us is not the clarification of a contract susceptible to more than one interpretation.  The expiry date in the letter of credit is as certain as words permit.  The requirement in the letter that Exxon certify, no later than October 31, 1981, that Houston "has failed to deliver ... between September and December, 1981" created no uncertainty on the face of the letter as to its expiration date.[18]

Counsel for both sides have stated that the phrasing of the required certification, that Houston *"has failed* to deliver" the crude oil, excludes the possibility of presentation before the end of the stated delivery period.  If that were indeed Exxon's understanding, then it should have refused the letter when tendered.  The terms of the credit departed in more than one respect from the Exxon-Houston contract.  As we have noted, that contract provided that the credit was to be payable "on presentation of invoices or [a] statement of an officer of Exxon certifying that invoices are unpaid and past due ten (10) days or more," and also provided that deliveries were to be made *during* September through December.  Houston instead applied to Paribas for a letter of credit requiring a statement "by an authorized representative certifying

---

12.  Tex.Bus. & Com.Code Ann. § 5.109(a), (a)(3) (Vernon 1968).

13.  *Uniform Customs* art. 8, para. c.

14.  *See Lamborn v. Nat'l Park Bank,* 240 N.Y. 520, 148 N.E. 664, 666 (1925).

15.  *Republic Nat'l Bank,* 578 S.W.2d at 114.

16.  *See Consolidated Aluminum Corp. v. Bank of Virginia,* 544 F.Supp. 386, 393–94 (D.Md.1982), *aff'd,* 704 F.2d 136 (4th Cir.1983).

17.  *See* J. Dolan, *The Law of Letters of Credit* ¶ 5.03[3][e] (1984).

18.  *Cf. Liberty Nat'l Bank & Trust Co. v. Bank of America Nat'l Trust & Sav. Ass'n,* 218 F.2d 831, 840–41 (10th Cir.1955); *BA Commercial Corp. v. Hynutek, Inc.,* 705 S.W.2d 713, 715 (Tex.Ct.App. 1986, no writ).

that Houston ... has failed to deliver ... between September and December." If either these discrepancies or the expiry date did not satisfy Exxon, it simply should have declined to accept the credit and refused to deliver oil to Houston. Exxon's decision to deliver suggests the possibility that, as contended by counsel for Paribas, Exxon was relying at least in part on its business dealings with Houston and its relationship with Imparato, a former crude oil trader at Exxon.

Exxon does not suggest that Paribas acted fraudulently. Nor does Exxon allege that Houston specified the expiration date of October 31 as the result of inadvertence or mistake, or that Exxon was mistaken as to that date when it accepted the letter. Indeed, the evidence shows that Exxon employees noted the expiry date upon their receipt of the letter of credit and that in late October Exxon asked Houston to obtain an extension of the expiry date.

Exxon does assert that Paribas did not act in "good faith" toward Exxon when it issued a letter of credit that its employees had questioned as "not mak[ing] sense" when Paribas knew that the letter was designed to secure Houston's contractual obligations to Exxon. No authority has been cited to us, and we have found none, that imposes on an issuer a duty to the beneficiary to "make sense" of the customer's application. As provided by Tex.Bus. & Com.Code Ann. § 5.109(a), Paribas did owe a duty of good faith to Houston, its customer. Tex.Bus. & Com.Code Ann. § 1.201(19) defines the standard of "good faith" as "honesty in fact in the conduct or transaction concerned." As mentioned earlier, Paribas checked with Houston both before and after issuing the letter to make sure that the terms specified in the application were what Houston intended. Thus, Paribas acted honestly toward Houston. Paribas' acceptance of Houston's assurances could not indicate dishonesty toward Exxon, for the expiration date was apparent on the letter when Paribas delivered it to Exxon. Paribas could tell Exxon no more than what was on the face of the

letter, and Paribas knew that Exxon could insist on amendments to the letter if it was not satisfied. Moreover, as already noted, Exxon has not alleged fraud against the bank or Houston. Paribas therefore complied entirely with the terms of the letter when it interpreted the credit as having expired on November 2 and released its security to Houston.

As a lawyer experienced in letter of credit transactions has written, cautioning issuers, "the legality of a letter-of-credit transaction should not be equated with its prudence or commercial sense."[19] In like measure, the issuer is not charged with determining the utility to, or prudence of, a beneficiary who acts in reliance on its letter of credit. In letter-of-credit transactions, as in many other legal areas, certainty of result and practicality of performance by laymen are of paramount importance. As Exxon asserts, it was required to comply with "whatever requirements that Paribas established" "to the last comma, the last semicolon, ... and, if they [did] that, they [were] entitled to be paid." It follows that, if Exxon did not do that, it was not entitled to be paid.

We therefore hold that the letter of credit issued by Paribas required no construction and that it terminated on its express expiry date. The summary judgment is REVERSED and judgment is entered for Paribas.

GARZA, Circuit Judge, dissenting.

I respectfully dissent.

The majority, focusing on the expiry date and nothing else, in effect makes the letter of credit involved in this case a nullity.

I agree with the court below that if Exxon had made any claim against the letter of credit before October 31, 1981, the Banque would not have honored any claim because Houston Oil and Refinery, Inc. still had the months of November and December to return to Exxon the oil that they had received under the original contract between Houston Oil and Refining, Inc. and Exxon.

---

**19.** Harfield, *Code, Customs & Conscience in Letter-of-Credit Law*, 4 U.C.C.L.J. 7, 14 (1971).

I am convinced that the Texas judge sitting on the court below, interpreting the letter of credit under Texas law, was correct. I would affirm the granting of summary judgment to Exxon on the basis of his memorandum opinion of September 17, 1986, which is attached as Appendix A to this dissent.

## APPENDIX A

United States District Court Southern District of Texas Houston Division

EXXON COMPANY, U.S.A., Plaintiff,

vs.

BANQUE DE PARIS ET DES PAY–BAS, Defendant.

Civil Action No. H–82–3481

### MEMORANDUM

This action requires the construction of a letter of credit (letter) issued by the Banque de Paris et des Pay-Bas (Paribas) for the benefit of Exxon Company, U.S.A., (Exxon) to secure an obligation of Houston Oil and Refining, Inc. (HORI). The parties have filed cross-motions for summary judgment. The court will grant Exxon's motion and deny Paribas's motion.

On July 9, 1981, Exxon and HORI entered into an oil exchange agreement (agreement). Exxon, finding that it had a temporary surplus of crude oil at its Baton Rouge refinery, contracted to ship HORI approximately 558,000 barrels of crude in July 1981, and HORI agreed to deliver the same amount of crude to Exxon during September through December, 1981. The agreement required HORI to secure its obligation by a letter of credit in favor of Exxon for $19,530,000. On HORI's application, Paribas, for a fee of approximately $50,000, issued the letter on July 16, 1981.

Two provisions of the letter clash. The certification provision requires that in order to collect under the letter, Exxon must certify that HORI failed to deliver the required volume of crude in September-December. On the other hand, the presentment clause requires the certification of non-delivery to be made by October 31,

1981. Exxon learned sometime in November that HORI was going to default. It presented the certification of HORI's default to Paribas on November 30, 1981, and again on December 1, 1981. Paribas rejected both presentments as untimely.

Exxon wants its money.

*Making Sense of the Letter of Credit.*

In the State of Texas letters of credit are subject to the same rules of construction that apply to ordinary contracts. *Temple-Eastex, Inc. v. Addison Bank,* 672 S.W.2d 793, 798 (Tex.1984); *Republic Nat'l Bank v. Northwest Nat'l Bank,* 578 S.W.2d 109, 115 (Tex.1978). The question of ambiguity in a contract is one of law. *Coker v. Coker,* 650 S.W.2d 391, 394 (Tex.1983); *R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.,* 596 S.W.2d 517, 518 (Tex.1980). A contract is ambiguous only where its meaning remains uncertain after application of the rules of construction. The letter is not ambiguous.

*Against the Drafter.*

Inconsistencies must be resolved against the party who drew the contract. *Temple-Eastex, Inc.,* 672 S.W.2d at 798; *Republic Nat'l Bank,* 578 S.W.2d at 115. This rule seems especially compelling here. Deposition testimony shows that shortly after the letter was issued a Paribas employee noticed the inconsistency and discussed it with HORI. Paribas never sought to amend the letter to remove the contradiction or to notify Exxon.

*Possibility of Performance.*

A construction in favor of Exxon is required by the rule that contracts must be construed to render performance possible. *Temple-Eastex, Inc.,* 672 S.W.2d at 798; *Republic Nat'l Bank,* 578 S.W.2d at 115. Obviously Exxon could not have certified on October 31 that HORI had not delivered through the end of the following two months. Paribas argues that practices in the industry were such that in the normal course of things Exxon should have known by October 31 that HORI would default. Assuming that to be the case, it does not follow that Exxon was bound to make presentment by October 31. The present-

ment provision required Exxon to certify that HORI had defaulted, not that it probably would. It is difficult to believe that Paribas would have cheerfully paid $19,-000,000 to Exxon for a default that had not yet taken place.

*BA Commercial Corp. v. Hynutek, Inc.,* 705 S.W.2d 713 (Tex.App.—Dallas 1986, no writ), supports Exxon's position. In that case the court construed a letter of guaranty that required Hynuteck to certify by December 31 that certain payments were more than twenty-five days past due. A payment fell due on December 31, and Hynucek made demand upon the guarantor at the end of January.

Ignoring the dictum about the letters of credit generally, the court in *BA Commercial* identified and applied the rules of construction that resolve this case.

> [A] fair reading of the guaranty shows that such an interpretation would defeat the express intent of the parties.
>
> \*    \*    \*    \*    \*    \*
>
> [R]equiring that 25 days notice be given by December 31, 1983, would, in effect, have made a proper demand technically impossible and, therefore, would be contrary to the intent of the parties.

*BA Commercial,* 705 S.W.2d at 716. The word "purpose" could be well substituted for "intent" in those two passages.

*Exxon Could Have Lied.*

Paribas, becoming disingenuous, maintains that there was nothing to stop Exxon from certifying by October 31 that HORI had defaulted, although a default had not occurred until mid-November. Paribas purports to have understood the certification simply as "a statement ... allowing Exxon to recover the proceeds of the letter of credit at any time during the specified period that it believed itself to be at risk in the transaction." (Paribas's January 1986 memorandum of law, p. 15). The court rejects this interpretation of certification for three reasons. First, it strains the court's credulity to believe that Paribas would or should have paid on Exxon's representation that it was merely feeling insecure about HORI's future performance.

HORI would have sued Paribas. Second, it is difficult to understand the reason for the requirement of certification if something less than an actual default were enough to trigger payment. One certifies the truth of specific, verifiable facts, not one's fears as to future performance. Had Paribas received a certification from Exxon of an unequivocal announcement of impending default by HORI, Paribas might have accepted it as an anticipatory breach or repudiation, but the facts do not give rise to that argument. Third and most important, where the plain wording of a letter of credit requires a party to certify the past occurrence of specific events, it is inimical to maintain that the actual truth of the certification is of no importance.

*Election of Remedies.*

Paribas also argues that Exxon cannot recover because Exxon has made an election of remedies. The basis of this claim is that, after failing to obtain payment from Paribas, Exxon in January 1982 entered into an agreement with HORI (1982 agreement). The purpose of this agreement was to rescue HORI's indebtedness to Exxon, both under the agreement that the letter was issued to cover and under another oil exchange agreement on which HORI had defaulted. In October 1982 HORI defaulted on the 1982 agreement. Exxon filed suit against it, and Paribas argues that in so doing Exxon foreclosed its option to sue Paribas. The court does not agree.

Election of remedies is defined in Texas as "the act of choosing between two or more inconsistent but co-existent modes of procedure and relief allowed by law on the same set of facts." *Custom Leasing, Inc. v. Texas Bank & Trust,* 491 S.W.2d 869, 871 (Tex.1973). The classic example of election of remedies involves a plaintiff's choice between two remedies that may be imposed on the same defendant, as between specific performance and damages in a contract case, or between negligence and intentional injury in a tort action. *Seegers v. Spradley,* 522 S.W.2d 951 (Tex.Civ.App. —Beaumont 1975), writ ref'd n.r.e.); *Fulmer v. Rider,* 635 S.W.2d 875 (Tex.App.— Tyler 1982, writ ref'd n.r.e.). Here, by

contrast, Exxon is proceeding under what are really two distinct contracts with two distinct obligors: the letter and the 1982 agreement with HORI.

*Accord or Novation.*

Similar to the election claim, Paribas argues that the 1982 agreement constituted either an accord and satisfaction or a novation. Neither claim is tenable. There is no indication that there was an agreement express or implied, between Exxon and HORI that Paribas would be released from its responsibility. That intention to release Paribas must have been embodied in their agreement for an accord and satisfaction to exist to Paribas's benefit. *E.g., San Benito Bank & Trust Co. v. Rio Grande Music Co.,* 686 S.W.2d 635, 640 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.). There is also no novation between Paribas and Exxon since Paribas and Exxon did not reach any agreement. *See Dodson v. Sizenbach,* 663 S.W.2d 13, 16 (Tex.App.—Houston [14th Dist.] 1983, no writ); *Villarreal v. Laredo Nat'l Bank,* 677 S.W.2d 600, 607 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.).

If HORI had performed the 1982 agreement and if Paribas had then paid Exxon, HORI may have been entitled to recover the payment from Exxon. That did not happen.

*Conclusion.*

A judgment will be entered in favor of Exxon for $19,530,000, pre-judgment interest at 6% from January 1, 1982, post-judgment interest, and costs of court, leaving attorneys' fees the only issue to be decided.

Signed on September 17, 1986, at Houston, Texas.

/s/Lynn N. Hughes
Lynn N. Hughes
United States District Judge